John MILLS, Jr., Petitioner–Appellant,

v.

Harry K. SINGLETARY, Secretary, Florida Department of Corrections, Respondent–Appellee.

No. 88–3945.

United States Court of Appeals, Eleventh Circuit.

Aug. 15, 1995.

Larry H. Spalding, Capital Collateral Representative, Billy H. Nolas, Judith J. Dougherty, Gail E. Anderson, Tallahassee, FL, for appellant.

Mark Menser, Asst. Atty. Gen., Dept. of Legal Affairs, Tallahassee, FL, for appellee.

Before TJOFLAT, Chief Judge, KRAVITCH and COX, Circuit Judges.

TJOFLAT, Chief Judge:

John Mills, Jr. is a Florida prison inmate. In 1982, a jury convicted him of first-degree murder, first-degree arson, kidnapping, burglary of a dwelling while armed, and grand theft. The trial court, following the jury's recommendation, sentenced Mills to death on the murder conviction; the court sentenced him to terms of imprisonment for the other crimes. After his conviction became final and he failed to obtain post-conviction relief in the state courts, Mills brought the instant petition for a writ of habeas corpus in the United States District Court for the Northern District of Florida seeking the vacation of his convictions and his death sentence. In his petition, Mills presented twenty federal constitutional challenges to his convictions and sentence; the district court rejected nineteen of the claims as legally insufficient and, following an evidentiary hearing, denied relief on the remaining claim. Mills appeals the district court's disposition of several of his claims. We hold that the district court properly declined to issue the writ. Accordingly, we affirm.

## I.

### A.

On the morning of March 5, 1982, Mills picked up Michael Fredrick at Fredrick's residence in Wakulla County, Florida.[1] Mills was driving an orange 1982 Dodge pickup truck that belonged to his mother. Mills and

---

1. Mills and Fredrick met while they were in jail together in February 1982. The facts set out in this part of the opinion are derived primarily from Fredrick's testimony as a witness for the prosecution at Mills' trial.

Fredrick went to Mills' mother's house for a short while; after they stepped outside the house to leave, Mills went back inside and retrieved a single-barrel, single-shot, 12–gauge shotgun that Fredrick had given Mills earlier in the week and placed it behind the seat of the truck. Following a brief stop, the two set out to burglarize a house.[2]

Mills and Fredrick then drove around Panacea, Florida in search of a target. After stopping at a trailer that appeared to be unoccupied but discovering that an elderly woman was at home, Mills and Fredrick left Panacea and drove into the Lake Ellen area. At some point, Mills became disoriented in some heavy rain and turned the truck around in front of a house; Fredrick later identified the house for the authorities. Sometime after turning around, Mills and Fredrick arrived at the trailer home of Les and Shirley Lawhon; because Shirley had gone to work in Tallahassee earlier that day in the Lawhons' only car, the trailer appeared unoccupied. Mills parked the truck, went to the door, and knocked. Les Lawhon answered the door and let Mills in; shortly thereafter Mills reappeared at the door and motioned Fredrick inside.[3]

When Fredrick entered the trailer, Mills was using the Lawhons' kitchen phone while Lawhon was rummaging through what appeared to Fredrick to be a phone book or a newspaper. Soon after Fredrick entered, Mills dropped the phone, grabbed a kitchen knife, and held it to Lawhon's throat. Lawhon said, "Please don't hurt me. Y'all take what you all want." Mills replied, "Shut up, cracker." Mills instructed Fredrick to check out the rest of the trailer; Fredrick looked into the trailer's bedrooms; no one was there. Mills then told Fredrick to check outside. Lawhon, apparently realizing that he would be forced to leave with his assailants, asked if he could put on his shoes. Mills told him he would not need his shoes where he was going.

Fredrick left the trailer to check outside; Mills and Lawhon soon exited the trailer as well. Mills had taken a double-barrel, 12–gauge shotgun from the trailer and walked behind Lawhon with the shotgun to Lawhon's head. Mills threw the truck keys to Fredrick and asked him to drive. Lawhon sat in the passenger's seat; Mills sat in the small space in the cab directly behind him, ·kept the shotgun trained on him, and gave Fredrick directions. Lawhon was trembling. Near the end of the drive, Lawhon asked what Fredrick and Mills were going to do to him. Mills told him, "I'm going to do to you what your forefathers did to my forefathers."

After driving approximately seven miles, Mills, Fredrick, and Lawhon arrived at an abandoned airstrip. Mills forced Lawhon out of the truck, ordered him to his knees, and tied his hands behind his back with a belt. Then, while Lawhon was on his knees, Mills struck him on the back of his head with a tire iron. Lawhon fell forward, bleeding from the back of his head. Mills watched Lawhon for a few moments and then turned to leave, saying, "Let's go." When Mills spoke, Lawhon sprang up and ran. Mills, shotgun in hand, chased him. Mills caught up with Lawhon in a nearby canal and grabbed his arm; Lawhon butted Mills in the stomach with his head and fled up the far bank of the canal, disappearing into thick underbrush. Mills, still pursuing Lawhon, vanished into the underbrush as well. Shortly after Fredrick lost sight of both men, he heard two gunshots. Mills returned to the truck; Lawhon did not. Mills' shirt was bloodied in the stomach area. He warned Fredrick not to say "anything about this" and suggested that they "go back to the house and clean it out and get everything we can sell."

Fredrick and Mills got back into the truck; Mills drove. At some point, Mills took off the bloody shirt and threw it on the passenger-side floorboard. Shortly thereafter,

---

**2.** Fredrick testified that Mills told Fredrick that "a hit" needed to be made. Fredrick agreed and replied that he knew where some marijuana plants were located. Mills responded, "No, man. I'm talking about ripping off some of these crackers," and Fredrick said, "Sure thing."

**3.** Because Mills contends that the race of Mills, Fredrick, and Lawhon played a role in the trial, we note that Mills and Fredrick are black and Lawhon was white. The case was tried before an all-white jury.

Mills stopped the truck and discarded the shirt in the bushes beside the road.

When Mills and Fredrick arrived at the Lawhons' trailer, they removed virtually everything of value, including Shirley Lawhon's jewelry and several guns. Mills exited the trailer last; he wiped the doorknob of the trailer as he left. Although Fredrick was not aware of it at the time, Mills had set the trailer on fire. Mills and Fredrick stopped at a nearby lake to better secure a cover concealing the stolen property. At that time, Fredrick took Shirley Lawhon's high school class ring from her jewelry box. After dropping Fredrick off near his house, Mills brought the stolen property to his mother's house, where he lived with his girlfriend, Fawndretta Galimore. He and Galimore put most of the property in a shed behind the house. Unbeknownst to Galimore, Mills put some of the property, including the firearms, in the house.

Meanwhile, the Lawhons' neighbors discovered that the Lawhon trailer was on fire and called the fire department. By the time the fire was extinguished, most of the trailer had burned. The authorities soon realized that Les Lawhon was missing and began an intensive search for him.

On March 9, four days after Les Lawhon's murder, Fredrick sold Shirley Lawhon's high school ring to a Tallahassee pawn shop; he filled out a receipt identifying himself and left a thumb print in doing so. Shirley Lawhon's initials were inscribed on the inside of the ring and were noted in the ring's description on the receipt.

About a week after the Lawhon murder, Mills and Galimore were at the Wakulla County courthouse to settle Mills' father's estate. A Wakulla County deputy sheriff recognized Mills and arrested him on an outstanding parole violation warrant. The deputy allowed Mills to say goodbye to Galimore before he was taken away. As Mills embraced Galimore, he quietly told her to get "rid of the property and stuff out of the

shed and in the bedroom," instructing her to look for the firearms under the bed. About five minutes later, while in the booking room of the county jail, Mills again whispered to Galimore to "[m]ake sure you get everything out of the shed and in the back room and under the bed." Galimore did as Mills instructed, moving the property to her mother's house in Tallahassee.

The case remained unsolved, and Lawhon's body undiscovered, for two months. On May 4, Gary Lassiter, an investigator in the Tallahassee Police Department, discovered that Fredrick, for whom an arrest warrant had issued on a burglary charge in an unrelated case, had pawned Shirley Lawhon's ring.[4] Lassiter promptly informed the Wakulla County Sheriff's Office, and, on May 6, Fredrick was arrested in Leon County. After he had been transported to Wakulla County, Lassiter and Sergeant Roxie Vause of the Wakulla County Sheriff's Office began questioning Fredrick about the burglary for which he had been arrested. They asked him whether he had obtained the ring in that burglary; they knew, of course, that it had been taken in the Lawhon burglary but said nothing about that case. Fredrick lied about where he had gotten the ring, and Lassiter and Vause did not press the issue. They did so the next day, though, when they began questioning Fredrick about Les Lawhon's disappearance, but Fredrick offered another lie about the ring's origin.

On May 8, prior to confessing his involvement in Les Lawhon's murder, Fredrick led Ray Fredericks, an agent of the FDLE, and Al Gandy, an investigator from the state prosecutor's office, to the abandoned airstrip where Mills shot Lawhon. Fredrick told Ray Fredericks and Gandy that Mills had brought him to the airstrip and asked him to guard someone, but he had refused. An extensive search of the area soon led to the discovery of Lawhon's remains.

Despite the discovery of the victim's body and his obvious involvement in the homicide,

---

4. Lassiter was checking the records of the Tallahassee pawn shop for any transactions in which Fredrick sold jewelry. He discovered the transaction involving the ring and contacted an agent of the Florida Department of Law Enforcement

("FDLE") to help determine to whom the ring belonged. The FDLE agent learned from the Lawhon family that the ring was Shirley Lawhon's and informed Lassiter.

Fredrick continued to vacillate, offering varying accounts of what he had done—or not done—and how he had obtained Shirley Lawhon's ring.[5]

Finally, on the evening of May 8, Fredrick confessed to Ray Fredericks and Gandy his and Mills' involvement in the Lawhon murder. Based on Fredrick's implication of Mills, the Wakulla County Sheriff obtained Mills' mother's consent to search her house. The police found a shotgun and other property matching the description of the Lawhons' property, executed a search warrant that day, and returned to the house and seized, among other things, a Stevens Model 311, double-barrel, 12–gauge shotgun. At trial, Fredrick identified that shotgun as the murder weapon, and Les Lawhon's father identified it as belonging to the victim. The police also arrested Galimore when she arrived at the house during the search; she turned all of the stolen property in her possession over to the police.

Gandy and Ray Fredericks questioned Mills on May 9 regarding his possible involvement in the Lawhon murder. Mills denied knowing Fredrick, denied ever owning or driving an orange Dodge pickup truck, denied any knowledge of the stolen property, and denied telling Galimore to move it. He was shaken when Gandy showed him a photograph of Lawhon and insisted that Gandy and others were "trying to hang something on" him.

Mills continued to communicate with Galimore through the mail following his arrest. In one letter, Mills told Galimore that "for all they know, you could have a receipt for the stuff," which, as she understood it, referred to the property Mills had instructed her to discard. He also wrote that Galimore should not be afraid, that he had told her about "those Caucasians" time and again. Mills wrote that "[t]hey might just tell you, you

could [go to prison for] 10 to 30 years to see your reaction" and that she should read the letter "with sense." Galimore recounted these statements at trial; she also testified that Mills sometimes called white people "devils."

B.

On May 19, 1982, a Wakulla County grand jury indicted Fredrick and Mills with one count each of first-degree murder, first-degree arson, kidnapping, burglary of a dwelling while armed, grand theft, and possession of a firearm by a convicted felon. The firearm possession charges were severed. On October 4, Fredrick entered into a plea agreement with the State. Fredrick pled guilty to burglary, grand theft, and kidnapping; he pled no contest to second-degree murder and first-degree arson. The plea agreement required that Fredrick testify truthfully at Mills' trial.

Mills' trial commenced on November 29, 1982. Fredrick testified in the State's case in chief; Galimore did also. As we discuss in subpart IV(F) below, she appeared voluntarily; the State made no prosecutorial concession for her testimony. In addition to Fredrick and Galimore, the prosecution presented the testimony of several expert witnesses. They opined, collectively, that Lawhon was probably killed by a gunshot wound to the face; that small holes in palmetto leaves near Lawhon's remains were consistent with number six shot, which is used (although not exclusively) in 12–gauge shotgun shells; that shot found on the ground near Lawhon's remains were also consistent with number six shot; and that two shotgun waddings found near Lawhon's remains were from a 12–gauge shotgun shell. These witnesses also said that no shoes had been discovered with or near the remains and that a shirt had been found where Fredrick said that Mills

5. Fredrick offered investigators at least seven different versions of his involvement; the prosecution and defense counsel both put the number at ten. Fredrick stated at various points that: (1) he obtained the ring from someone in "Frenchtown;" (2) he obtained the ring from someone named "Miss Copeland;" (3) he stole the ring from Galimore's car; (4) Mills had come by with his truck full of property and taken Fredrick to a

nearby lake, where Fredrick took the ring from the truck without Mills' knowledge; (5) Mills had taken him to an abandoned airstrip and asked him to guard someone and Fredrick had refused; (6) Fredrick had gone with Mills and "checked out" the Lawhons' trailer, along with two other trailers, but had done nothing else; and (7) Fredrick and Mills burglarized the Lawhons' trailer, but no one was home at the time.

had disposed of his shirt as they drove back to the Lawhons' trailer after the killing. Fredrick positively identified the shirt at trial, and tests indicated a blood stain on its lower front. In addition to the foregoing, Gandy recounted Mills' false exculpatory statements, and a witness testified that she had seen an orange Dodge pickup truck with two or three black individuals inside turn around in her driveway on the afternoon of Lawhon's murder. Fredrick had led the police to the witness' house; he identified a photograph of the residence before the jury.

The defense strategy was to paint Fredrick as an untruthful witness by highlighting his inconsistent stories to the police and by raising the possibility that Fredrick had kidnapped and murdered Lawhon alone or with the help of unknown accomplices. Mills testified in his own defense; his testimony emphasized that Fredrick had owed him money. Mills and Fredrick had met in jail in February 1982—when they shared a cell for fifteen days—and Galimore had bailed Fredrick out of jail at Mills' request by posting a $175 bond. Mills claimed that Fredrick had agreed to pay him $200 on the day he was released from jail if Mills would post the $175 bail. After Fredrick was released, Mills testified, Fredrick did not repay him.[6] After several attempts to get Fredrick to pay him back, Mills told Fredrick that Fredrick owed him "dollar on a dollar" interest for each day that he was not repaid.

Mills claims that, on the day in question, he was taking a break from painting the family cafe, which was next to his mother's house, when Fredrick knocked on the door. Fredrick asked if he could borrow Mills' truck to get the money he owed Mills. After running an errand and returning briefly to Mills' mother's house, Mills and Fredrick drove to a 40–acre plot of land about a mile from the house.[7] Mills testified that he needed to check the height of some timber he had planted there; he had not checked the growth of the trees for a number of years. After he got out to survey the timber, Fre-

drick left with the truck, saying that he would return soon.

Fredrick did not return for two or three hours. Mills explained that, after looking at the trees, which did not take long, he waited by the side of the road in heavy rain until Fredrick returned. The truck was loaded with property when Fredrick finally came back. Although Fredrick did not say where he had obtained the property, he told Mills to take it as payment of the interest and as a token of his gratitude to Mills for bailing him out of jail. Mills then took the truck and left Fredrick standing in the pouring rain— twelve miles from Fredrick's house. According to Mills, someone whom Fredrick did not identify was to pick him up. Mills carried the property to his mother's house, where he and Galimore unloaded it—placing it in the shed behind the house.

Mills admitted that, following his arrest, he told Galimore to remove the property from the shed; he claimed that he was worried about theft, as the shed had been broken into once before. He also admitted telling Galimore to take the property out of the house, citing the same concern. He testified that his reference to a receipt in his letter to Galimore was a reference to Galimore's receipt for Fredrick's $175 bail. He could not explain, however, why he did not say that in the letter. Finally, Mills said that he lied to Gandy because he had argued with him before in a previous case.

At the conclusion of the guilt phase of the trial, the jury convicted Mills on all counts of the indictment. The trial then entered its sentencing phase. In the State's case, the prosecutor called one witness: a probation and parole officer from the Florida Department of Corrections who testified that Mills was on parole at the time he killed Les Lawhon. Aside from the testimony of this witness, the State relied exclusively on the testimony and evidence presented during the guilt phase of the trial to support its case for a death penalty recommendation from the jury. Mills' case consisted of the testimony

---

**6.** Fredrick was released on February 22. Mills did not dispute that, after he was released from jail on February 26, he and Fredrick saw each other frequently. He insisted, however, that he saw Frederick only in an attempt to collect the debt.

**7.** Mills denied taking a shotgun from the house.

of a psychiatrist, Dr. Na'im Akbar, who described Mills' mental and psychological outlook and opined that Mills' potential for rehabilitation was excellent.

At the close of the evidence at the sentencing phase, the court, in charging the jury on its duty to recommend that either a sentence of death or of life imprisonment be imposed, instructed the jury that it should consider five statutory aggravating circumstances. The court instructed the jury to consider whether: (1) the crime was committed while the defendant was under a sentence of imprisonment; (2) the crime was committed while the defendant was engaged in the commission, the attempted commission, or the flight after the commission or attempted commission, of the crime of kidnapping; (3) the crime was committed for pecuniary gain; (4) the crime was committed in a "cold, calculated or premeditated manner without any pretense of moral or legal justification" [hereinafter the "cold, calculated circumstance"]; and (5) the crime was "especially wicked, evil, atrocious, or cruel" [hereinafter the "atrociousness circumstance"].[8] *See* Fla. Stat.Ann. §§ 921.141(5)(a), (d), (f), (h), (i) (West 1985 & Supp.1995). The court also instructed the jury regarding both statutory and nonstatutory mitigating circumstances.

The jury recommended by a vote of ten to two that Mills receive the death penalty. The court followed the jury's recommendation and sentenced Mills accordingly.[9] In its written judgment, the trial court found the five aggravating circumstances listed above but no statutory or nonstatutory mitigating circumstances.

### C.

The Supreme Court of Florida affirmed Mills' convictions and sentences on direct appeal. *Mills v. State,* 462 So.2d 1075 (Fla.) (per curiam) (*"Mills I"*), *cert. denied,* 473 U.S. 911, 105 S.Ct. 3538, 87 L.Ed.2d 661 (1985). The Governor of Florida thereafter

signed a death warrant setting Mills' execution for May 7, 1987. Nine days before Mills' scheduled execution, on April 28, Mills moved the trial court under Rule 3.850 of the Florida Rules of Criminal Procedure to vacate his convictions and sentences. *See* Fla. R.Crim.P. 3.850. In his Rule 3.850 petition, Mills raised seventeen claims, including ineffective assistance of counsel during the guilt phase of the trial, ineffective assistance of counsel during the sentencing phase, failure of the prosecution to reveal exculpatory evidence in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and improper comments by the prosecution in its closing argument to the jury at both the guilt and sentencing phases. The trial court, after holding a two-day evidentiary hearing on the *Brady* claim and the claim of ineffective assistance of counsel during the sentencing phase, denied relief. For reasons that are unclear, the trial court did not hold an evidentiary hearing on Mills' claim of ineffective assistance of counsel during the guilt phase, finding the claim "not ... cognizable under Rule 3.850." *State v. Mills,* No. 65–82–CF–50A, slip op. at 6 (Fla.Cir.Ct. May 4, 1987). The Supreme Court of Florida affirmed. *Mills v. State,* 507 So.2d 602 (Fla. 1987) (per curiam) (*"Mills II"*). While Mills' Rule 3.850 appeal was pending, Mills filed his first petition for writ of habeas corpus and an application for stay of execution in the Supreme Court of Florida; the court denied both the habeas corpus petition and the application for stay. *Id.*

On May 6, 1987, Mills filed the instant petition for a writ of habeas corpus in the United States District Court for the Northern District of Florida, presenting twenty claims for relief. The district court granted a stay of execution, dismissed nineteen of Mills' claims as legally insufficient, and held a two-day evidentiary hearing on Mills' claim of ineffective assistance of counsel during the guilt phase of the trial. After considering the evidence presented in support of that

---

8. Although the statutory language for this aggravating circumstance reads "especially heinous, atrocious, or cruel," *see* Fla.Stat.Ann. § 971.141(5)(h), the trial judge used a different phrasing—"especially wicked, evil, atrocious, or cruel"—in his instruction to the jury.

9. The trial court also sentenced Mills to 99 years imprisonment for burglary, 99 years imprisonment for kidnapping, 30 years imprisonment for arson, and 5 years imprisonment for grand theft.

claim, the court rejected the claim as meritless. The district court thereupon denied Mills the relief he requested. The court, however, issued a certificate of probable cause, and Mills now appeals.[10]

Mills has abandoned on appeal most of the claims he raised in the district court. In Part II below, we address Mills' claim that pretrial publicity and events that occurred during trial rendered his trial fundamentally unfair. In Part III, we briefly address Mills' claim that the prosecution's pretrial solicitation of comments from various persons, including county and court officials, about the venirepersons who had been summoned for the case denied him a fair trial. In Part IV, we consider Mills' claims that the prosecution withheld exculpatory evidence. In Part V, we address Mills' claims that he received ineffective assistance of counsel at both the guilt and sentencing phases of his trial. Finally, in Part VI, we consider whether we should address on the merits two procedurally barred claims—that the prosecution made improper comments in its closing argument during both the guilt and sentencing phases.[11]

## II.

Mills contends that both pervasive pretrial publicity and events that occurred during his trial rendered his trial fundamentally unfair. We address the merits of this claim after a brief review of its procedural history.

## A.

Citing adverse pretrial publicity, Mills moved the trial court for a change of venue on four separate occasions. He filed his first motion seven weeks before his trial began. Following an evidentiary hearing concerning the extent of the publicity, the court denied Mills' motion without prejudice to his right to renew it when the case came to trial.[12]

Mills renewed the motion immediately before the court and counsel began their voir dire of the venire that had been summoned for the trial; he presented a recent newspaper article about the case and repeated his

10. While Mills' petition was pending before the district court, he filed a second state habeas corpus petition in the Supreme Court of Florida; the court denied relief without opinion on February 15, 1988. *See Mills v. Dugger*, 523 So.2d 578 (Fla.1988) (*"Mills III "*). While Mills' appeal was pending before this court, he requested that the proceedings be held in abeyance pending the filing and disposition of a third habeas corpus petition in the Southern District of Florida. We granted that request on October 3, 1989. Mills thereafter filed a habeas petition in the supreme court; the court denied relief on that petition on November 8, 1990. *See Mills v. Dugger*, 574 So.2d 63 (Fla.1990) (per curiam) (*"Mills IV"*).

On April 16, 1991, Mills filed a motion requesting this court to relinquish jurisdiction to the district court for consideration of the issues generated by the Supreme Court of Florida's disposition of Mills' third habeas corpus petition. This court denied the motion. Mills subsequently filed a fourth habeas corpus petition with the supreme court; the court denied relief on that petition on April 1, 1993. *See Mills v. Singletary*, 622 So.2d 943 (Fla.1993) (per curiam) (*"Mills V"*).

11. Mills also raises two new claims on appeal, arguing that the trial court's charge to the jury in the sentencing phase of the trial regarding the atrociousness circumstance and the cold, calculated circumstance were constitutionally inadequate. The law in this circuit is clear that argu-

ments not presented in the district court will not be considered for the first time on appeal. *Lancaster v. Newsome*, 880 F.2d 362, 371 (11th Cir. 1989); *see also Stephens v. Zant*, 716 F.2d 276, 277 (Former 5th Cir.1983) (per curiam). Even if Mills had raised the claims before the district court, however, we would not consider the claims because he failed to object at trial to the wording of the jury instructions on these two aggravating circumstances. He also failed to challenge the instructions on direct appeal. Mills did raise the issue in his third and fourth habeas corpus petitions to the Supreme Court of Florida. The supreme court, however, held that the claims were procedurally barred, *see Mills IV*, 574 So.2d at 64–65; *Mills V*, 622 So.2d at 944; they had not been raised on direct appeal. Although Mills argues that he objected at trial and raised the issue on direct appeal, the record plainly indicates that his objection to the challenged jury instructions was based on the argument that the evidence was insufficient to establish the two aggravating circumstances; the objection clearly was *not* that the language of the instructions was constitutionally infirm. *See also Mills V*, 622 So.2d at 944.

12. Mills also moved the court to grant the defense additional peremptory challenges. The court granted this request and increased the number of both the prosecution's and Mills' peremptory challenges from ten to sixteen. In addition, the court granted the parties' request to sequester the jury.

earlier argument that it would be impossible to empanel a fair and impartial jury. The court remained unconvinced, however, and denied the motion. Mills' third attempt to obtain a change of venue took place after he had exercised his last peremptory challenge and the court had refused his request for additional challenges. Again, the court denied the motion. Mills renewed his motion for the last time when the prosecution, having exhausted its peremptory challenges, accepted the twelve venirepersons seated in the jury box. The court, finding that a fair and impartial jury able to put aside the pretrial publicity could, and would, be empaneled, denied Mills' motion.[13]

On direct appeal, Mills claimed error in the trial court's refusal to grant a change of venue. The Supreme Court of Florida, concluding that the record supported the trial court's finding regarding the jury's impartiality, rejected Mills' claim. *Mills I*, 462 So.2d at 1079.[14] The district court rejected the claim as well, holding that Mills failed to show that he suffered any actual or presumed prejudice as a result of the pretrial publicity.

**B.**

■ The Due Process Clause of the Fourteenth Amendment incorporates the Sixth Amendment and thus guarantees the right of state criminal defendants to be tried "by a panel of impartial, 'indifferent' jurors ... [whose] verdict must be based upon the evidence developed at trial." *Irvin v. Dowd,*

366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961) (citations omitted). To prevail on his claim that he did not receive a fair trial, Mills must establish that the pretrial publicity and other events surrounding his trial resulted in either actual or presumed prejudice. *Coleman v. Kemp,* 778 F.2d 1487, 1489 (11th Cir.1985), *cert. denied,* 476 U.S. 1164, 106 S.Ct. 2289, 90 L.Ed.2d 730 (1986); *Coleman v. Zant,* 708 F.2d 541, 544 (11th Cir.1983). We examine each standard in turn.

**1.**

■ To demonstrate actual prejudice, Mills must prove that "one or more jurors entertained an opinion before the trial" that Mills was guilty and "that these jurors could not put this prejudice aside and render a verdict based solely on the evidence presented." *United States v. De La Vega,* 913 F.2d 861, 864–65 (11th Cir.1990), *cert. denied,* 500 U.S. 916, 111 S.Ct. 2011, 114 L.Ed.2d 99 (1991); *United States v. Lehder–Rivas,* 955 F.2d 1510, 1525 (11th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 347, 121 L.Ed.2d 262 (1992). Mills has not shown that even one juror, prior to hearing the evidence, had formed an opinion that he was guilty.[15] Even if Mills had presented evidence indicating that a juror had formed such an opinion, he still would have had to show that the juror could not have rendered a verdict based on the evidence presented. *Lehder–Rivas,* 955 F.2d at 1525.[16] Mills has not established actual prejudice in this case.

13. After the twelve jurors were empaneled, two alternates were selected. One of the alternates entered service on the jury at the beginning of the second day of testimony in the State's case in chief when one of the original jurors was excused for health reasons.

14. Mills also raised this claim in his Rule 3.850 petition in the state trial court. Because the claim was not cognizable in a Rule 3.850 proceeding, and had been addressed on direct appeal, the trial court did not pass on its merits. The supreme court affirmed. *See Mills II*, 507 So.2d at 603.

15. The jurors had been exposed to some pretrial publicity regarding the case. Of the twelve, five had heard some discussion of the case in the community; one had discussed the case in pass-

ing with her family; ten had read about the case in the newspaper; and seven had seen something about the case on television. As we discuss in more detail *infra*, however, the pretrial publicity in this case was essentially factual and was not so pervasive or insidious as to raise the presumption that any venireperson exposed to it was rendered incapable of giving Mills a fair trial; moreover, each person chosen as a juror in this case stated that he or she had formed no opinion as to Mills' guilt or innocence.

16. In denying Mills' third and fourth motions for a change of venue, the trial court impliedly found that actual prejudice had not tainted the panel that had been selected to try the case. Neither the Supreme Court nor this court has resolved the issue of whether the finding of a lack of actual prejudice—as to the panel as a whole

2.

■ To determine whether Mills has established presumed prejudice, we examine whether: (1) the pretrial publicity was sufficiently prejudicial and inflammatory; and (2) the publicity saturated the community in which the trial was held. *See Coleman,* 708 F.2d at 544 (relying on *Murphy v. Florida,* 421 U.S. 794, 798–99, 95 S.Ct. 2031, 2035–36, 44 L.Ed.2d 589 (1975); *Rideau v. Louisiana,* 373 U.S. 723, 726–27, 83 S.Ct. 1417, 1419–20, 10 L.Ed.2d 663 (1963); and *Mayola v. Alabama,* 623 F.2d 992, 997 (5th Cir.1980), *cert. denied,* 451 U.S. 913, 101 S.Ct. 1986, 68 L.Ed.2d 303 (1981)). This court has repeatedly noted that the principle of presumed prejudice "is rarely applicable and reserved for extreme situations." *Bundy v. Dugger,* 850 F.2d 1402, 1424 (11th Cir.1988), *cert. denied,* 488 U.S. 1034, 109 S.Ct. 849, 102 L.Ed.2d 980 (1989); *Woods v. Dugger,* 923 F.2d 1454, 1459 (11th Cir.), *cert. denied,* 502 U.S. 953, 112 S.Ct. 407, 116 L.Ed.2d 355 (1991).[17]

a.

■ At the hearing on his first motion for a change of venue, which was held in early October 1982, Mills presented testimony regarding articles that had been published in the *Tallahassee Democrat* and the *Wakulla News.* The circulation of the *Tallahassee Democrat* in Wakulla County was 1595 daily and 2230 on Sunday. The *Wakulla News,* a local weekly publication, had a total circulation of 3000: 2000 by subscription and 1000 from newsstands. The population of Wakulla County was approximately 11,000.

The *Tallahassee Democrat* published a total of ten articles about the case prior to the commencement of the venire voir dire on November 29, 1982. Each of the articles except the tenth was before the court when it considered Mills' initial motion for a change of venue; all were before the court when it considered his subsequent motions. Five of these articles, appearing between March 7 and March 15, conveyed factual information about Les Lawhon's disappearance, covered the ensuing search for him, and noted the Wakulla County sheriff's opinion that the fire that consumed the Lawhons' trailer appeared to have been set to conceal the theft of property.

Only four *Tallahassee Democrat* articles, published on May 10, May 11, May 20, and November 28, respectively, mentioned Mills. The first three of these articles stated that Mills was a suspect, that Mills was in jail for violating the conditions of his parole, and that the alleged murder weapon had been found in the Mills residence. The November 28 article, which Mills introduced immediately prior to the commencement of the venire voir dire, stated that Fredrick was to testify against Mills, mentioned again that Mills was in jail for parole violation and that the suspected murder weapon had been found in the Mills residence. The *Tallahassee Democrat* did not publish any editorials about the case.

Mills cited five *Wakulla News* articles in urging the court to move the trial's venue. Two of the articles were published in March; one was published in May, one in August, and one in October. The first two articles focused on Les Lawhon's disappearance and

rather than as to each individual juror—is a mixed one of fact and law, still subject to the "manifest error" standard set forth in *Irvin,* or one purely of fact, subject to the "fairly supported by the record" standard of 28 U.S.C. § 2254(d). *See Patton v. Yount,* 467 U.S. 1025, 1031 n. 7, 104 S.Ct. 2885, 2889 n. 7, 81 L.Ed.2d 847 (1984); *Irvin,* 366 U.S. at 723–24, 81 S.Ct. at 1643–44; *Coleman,* 778 F.2d at 1537–38. In *Patton,* because the petitioner had not shown "manifest error," the standard more favorable to the petitioner, the Supreme Court did not address the issue. Similarly, we do not address the issue here because Mills has failed to demonstrate that the trial court's finding that the panel was impartial constituted "manifest error." *See Bundy v. Dugger,* 850 F.2d 1402, 1427 (11th

Cir.1988), *cert. denied,* 488 U.S. 1034, 109 S.Ct. 849, 102 L.Ed.2d 980 (1989); *cf. Presnell v. Zant,* 959 F.2d 1524, 1534 (11th Cir.1992) (noting that, regardless of the standard applied, the finding is "entitled to a significant presumption of correctness" and holding that petitioner had not overcome that presumption).

17. This court has not yet defined precisely the burden that a petitioner must meet to establish presumed prejudice except to stress that "the burden placed upon the petitioner to show that pretrial publicity deprived him of his right to a fair trial is an extremely heavy one." *Coleman,* 778 F.2d at 1537. We do not address the issue here because Mills does not satisfy any of the applicable standards.

the ensuing search for him. The third, published on May 13, reported the discovery and identification of Lawhon's remains, that Fredrick had assisted the police in finding the body, that Fredrick and Mills had been indicted for murder, and that Galimore had been charged as an accessory after the fact. The article also reported that Lawhon appeared to have been killed by a shotgun blast to the head and that a search of the Mills residence had resulted in the seizure of a double-barrel shotgun thought to have been stolen from the Lawhons' trailer. Finally, the article said that Mills had been jailed for violating his parole. The fourth article, published August 19, reported that the trial date had been set, and the fifth article, published October 14, covered Fredrick's change of plea. Like the *Tallahassee Democrat,* the *Wakulla News* published no editorials about the case.

Finally, Mills presented the testimony of a resident of Wakulla County. The resident testified that he had heard the Lawhon murder discussed several times at work, that numerous people had expressed the opinion that Mills was guilty, and that every new newspaper article about the case had spurred conversation. He also stated that he was approached one night by two men who told him "get [your] gun and let's go to the jailhouse and break in and get them out and do away with them."[18]

Mills contends that the statements of the venirepersons on voir dire support his argument that we should presume prejudice in this case; we therefore examine those statements. The venire summoned for the case consisted of eighty Wakulla County residents. With the court and counsel in chambers, these prospective jurors were examined in groups of three regarding their exposure to pretrial publicity and their views about the death penalty.[19] After each examination, the group returned to the courtroom, and the court entertained and ruled on any challenges for cause.

Seventy-four of the eighty who had been summoned had heard of or read about the case. Of those seventy-four, fifty-five had seen or read at least one newspaper article about it. The court excused nine of the venire due to bias and excused one for a combination of bias and an unqualified preference for the death penalty. Of these ten, four had formed an opinion about the case based on discussion they had heard in the community; one had formed an opinion from reading newspaper articles and watching TV news; three had formed an opinion based on a combination of community talk, newspaper articles, and TV coverage; and two were biased for other reasons. The court denied four challenges for cause that Mills made during the in-chambers voir dire; only two of these challenges were based on bias due to pretrial publicity. The court excused eleven of the venire because of their opposition to the death penalty, bringing to twenty-one the total number excused as a result of the in-chambers examination. The fifty-nine venirepersons remaining were then subjected to general voir dire in the courtroom. Of this group, three were stricken for cause: two for bias in favor of Mills and one because he knew both the Lawhon and the Mills families.

b.

Mills was not entitled to a jury "ignorant about relevant issues and events." *Lehder–Rivas,* 955 F.2d at 1524. Rather, Mills is entitled to relief only if he establishes that

18. Mills also presented the affidavit of the news director of a local television station. The affidavit stated that the news broadcast announcing Mills' arrest was watched by 93% of the television audience who had their sets on at the time but did not indicate the total size of the viewing audience. The affidavit also stated that a second news broadcast mentioned Mills. Finally, Mills presented three identical affidavits from residents of Wakulla County opining that Mills could not get a fair trial in the county.

19. Prior to trial, Mills moved the court to have the venirepersons examined individually in chambers, instead of the courtroom, concerning any pretrial publicity to which they may have been exposed. Although the State did not oppose Mills' motion, the court advised counsel that, for purposes of efficiency, the venirepersons would be examined about their exposure to publicity, and their views concerning the death penalty as well, in groups of three to six. When the time for the examination arrived, the court changed its mind and allowed counsel to question the jurors in groups of three.

" 'the populace from which [his] jury was drawn was widely infected by a *prejudice* apart from mere familiarity with the case.' " *Devier v. Zant,* 3 F.3d 1445, 1462 (11th Cir. 1993) (per curiam) (quoting *Mayola,* 623 F.2d at 999), *cert. denied,* —— U.S. ——, 115 S.Ct. 1125, 130 L.Ed.2d 1087 (1995). We are satisfied that the media coverage of this case "was essentially factual and was not directed at arousing or inciting the passion of the community." *Id.* Most of the newspaper articles about the case did not mention Mills, but rather reported the progress of the search for Les Lawhon. Moreover, the articles that mentioned Mills did so in the context of reporting on an unfolding case. No editorials sounded the call for justice, nor did any county officials make public, blatantly prejudicial comments. *See Coleman,* 778 F.2d at 1538–40 (finding presumed prejudice partially based on the widespread reporting of the county sheriff's statement that he would like to "pre-cook" the defendants in an oven before they were executed). Finally, the disclosure that Mills was in jail for a parole violation did not suggest that juror prejudice should have been presumed. *See Marsden v. Moore,* 847 F.2d 1536, 1543 (11th Cir.) (holding that petitioner had failed to establish presumed prejudice despite a substantial number of jurors' exposure to newspaper articles disclosing inadmissable evidence), *cert. denied,* 488 U.S. 983, 109 S.Ct. 534, 102 L.Ed.2d 566 (1988); *cf. Bundy,* 850 F.2d at 1425 ("[P]rejudice is not presumed simply because the defendant's criminal record is well publicized."). Our conclusions regarding the publicity are borne out in the voir dire; those excused for bias constituted less than fifteen percent of the venire.

c.

■ As part of his presumed prejudice argument, Mills posits that the victim's father "repeatedly attempted to influence the proceedings. He gestured from a witness room, harassed spectators, and caused sufficient ruckus to require the judge to move the family back away from the jury." Mills argues that this conduct, when considered with

the pretrial publicity in "the totality of the circumstances," denied him a fair trial. Mills relies on the requirement of *Woods v. Dugger,* 923 F.2d 1454 (11th Cir.), *cert. denied,* 502 U.S. 953, 112 S.Ct. 407, 116 L.Ed.2d 355 (1991), that this court "evaluate the fairness of [Mills'] trial in light of both pretrial publicity *and* occurrences taking place during the trial." *Id.* at 1457 (emphasis added) (citing *Sheppard v. Maxwell,* 384 U.S. 333, 352, 86 S.Ct. 1507, 1517, 16 L.Ed.2d 600 (1966)). *Woods* derived this standard from the Supreme Court's command in *Sheppard* that courts evaluate claims of an unfair trial by examining the " 'totality of circumstances.' " *Woods,* 923 F.2d at 1457 (quoting *Sheppard,* 384 U.S. at 352, 86 S.Ct. at 1517).

Only two of the occurrences Mills complains of are supported by the trial record. On the first day of trial, Roosevelt Randolph, Mills' attorney, stated during a discussion of his invocation of the witness sequestration rule that "I think they have indicated they have some problems obviously with security and I want to make sure that everybody is watched in that courtroom."[20] At the beginning of the second day of the trial, Randolph stated, "Judge, there is another matter I want to bring to the Court's attention. If we could, could we keep these first two rows [in the spectators' section of the courtroom] empty?" The judge responded, "We have got them roped off already where there won't be anybody in them." Later that day, the trial judge, in a meeting with counsel in chambers, explained for the record that

[a]t the beginning of the trial this morning, on 12–2–82, at the request of the Defense counsel and at the request of the bailiff, and also by the common sense of the Court and looking at the courtroom, thought it in the best interest of the defendant and all of the personnel of the courtroom to block off the first two rows of seats behind the counsel for the Defense and the State, for their welfare or the possibility of any violence, and the same was so done.

The record does not indicate that the clearing of the first two rows of the courtroom was the result of any defined incident, such

---

**20.** To ensure that the security in and around the courtroom was adequate, Randolph (and the prosecutor) agreed that two officers, who were

minor witnesses in the case, should be excused from the rule and remain in the courtroom.

as a "ruckus" caused by the victim's father; rather, it appears that the rows were cleared only out of an abundance of caution. In addition, nothing in the record indicates that the jury was aware of any problem.

On the morning of the third day of trial, after the jury had been seated and two witnesses had testified, Randolph requested a sidebar. The court granted the request, and the following exchange occurred at sidebar:

MR. RANDOLPH: Your Honor, I want the record to clearly reflect that what is going on, I think the need to keep the witnesses in the witness room. Reverend Lawhon just made a gesture, when the door was open right then, to the counsel table while he went to the water fountain. I don't know what he said or whatever, but I think we need to carefully watch him for security purposes. Because he made some gesture at that point.

MR. KIRWIN [the prosecutor]: Did he make it toward you?

MR. RANDOLPH: He made it toward the counsel table.

THE COURT: Claxton, you make sure the witnesses stay in the witness room. They're already making gestures toward the counsel table.

MR. KIRWIN: For the record, Judge, I agree that needs to be stopped.

Mills did not move the court to declare a mistrial when these incidents occurred; nor did he assert, in his motion for a new trial, that they warranted the vacation of the jury's verdicts and a retrial of the case. Mills did contend on direct appeal, however, that these incidents supported his claim that the trial court erred in refusing to grant a change of venue. The Supreme Court of Florida addressed the allegations and concluded that "[n]one of the incidents of bad feeling that Mills argues took place during the trial were of such magnitude as to render the impartiality of the jury suspect." *Mills I*, 462 So.2d

at 1078–79. Because the state court addressed these occurrences on the merits, we do so as well.

The Due Process Clause requires courts to guard against the possibility that "the atmosphere in and around the courtroom might [become] so hostile as to interfere with the trial process, even though ... all the forms of trial conformed to the requirements of law." *Estes v. Texas*, 381 U.S. 532, 561, 85 S.Ct. 1628, 1642, 14 L.Ed.2d 543 (1965) (Warren, C.J., concurring). Even when we consider the pretrial publicity in conjunction with the events recounted above, however, Mills has failed to establish that his jury was not impartial or his trial fundamentally unfair. The trial judge acted quickly to quell any events or actions that could have prejudiced or disturbed the jury. These two "disruptions," by themselves or in conjunction with the other facts Mills asserts, did not deprive Mills of a fair trial. We do not believe that Mills was "deprived of that 'judicial serenity and calm to which [he] was entitled.'" *Sheppard*, 384 U.S. at 355, 86 S.Ct. at 1518 (quoting *Estes*, 381 U.S. at 536, 85 S.Ct. at 1629).[21] In sum, Mills has not established that the pretrial publicity, standing alone or in combination with the courtroom occurrences he cites, gives rise to a case of presumed prejudice.

### III.

█ Mills claims that the prosecutor's pretrial solicitation of comments about potential jurors from the Wakulla County Sheriff, a deputy sheriff, the bailiff assigned to the case, the clerk of the court, and the victim's father denied him a fair trial. After the list of the venirepersons who were being summoned for the case had been made public, the prosecutor gave copies of the list to those five individuals and asked for comment. They returned the lists with notations opposite the names of the people they knew. Mills first raised this claim in his Rule 3.850

---

**21.** In his habeas corpus petition in the district court, Mills attached an affidavit by Randolph in which Randolph stated that "Glen Lawhon, while on the witness stand testifying for the State and identifying a rifle, pointed the rifle directly at me and John Mills. I interpreted the pointing of the gun in that direction as a threat to me and

my client." The record, however, does not indicate any unusual occurrences during Glenn Lawhon's testimony; it certainly does not reflect any objections by Mr. Randolph regarding the incident he cites. In fact, nothing in the record indicates that this conduct took place.

petition, and the trial court denied it on the merits. The Supreme Court of Florida summarily affirmed, *see Mills II,* 507 So.2d at 603–05; the district court, in denying Mills' habeas petition, denied the claim as well.

Mills does not allege that the prosecutor's conduct in soliciting the comments, or the making of the comments, was brought to the attention of anyone on the venire list. Nor does he allege that the Sheriff, deputy sheriff, bailiff, court clerk, or victim's father contacted, directly or indirectly, anyone on the list. The Rule 3.850 court, after hearing testimony on this issue, found "no evidence of misconduct. . . . No one contacted any venireman and at no time was any venireman aware that the State ever spoke to these individuals." *State v. Mills,* slip op. at 6; *cf. Johnson v. Wainwright,* 778 F.2d 623, 627 (11th Cir.1985) ("[T]here has been no allegation that the jury even knew of [the sheriff's] participation in the jury selection process."), *cert. denied,* 484 U.S. 872, 108 S.Ct. 201, 98 L.Ed.2d 152 (1987).

The clerk of the court testified that he had furnished similar assistance to Randolph, Mills' counsel, in the past, and that, over time, both prosecutors and defense counsel had asked the clerk about the suitability of summoned venirepersons for jury service in a case. Randolph testified that he had reviewed the venire list with his investigator and a local black community leader. Mills cites *Thompson v. White,* 661 F.2d 103 (8th Cir.1981), *vacated and remanded,* 456 U.S. 941, 102 S.Ct. 2003, 72 L.Ed.2d 463 (1982), *aff'd after remand,* 680 F.2d 1173 (8th Cir. 1982) (per curiam), *cert. denied,* 459 U.S. 1177, 103 S.Ct. 830, 74 L.Ed.2d 1024 (1983), and *Henson v. Wyrick,* 634 F.2d 1080 (8th Cir.1980), *cert. denied,* 450 U.S. 958, 101 S.Ct. 1417, 67 L.Ed.2d 383 (1981), in support of his argument that the prosecution's conduct deprived him of a fair trial. In both *Thompson* and *Henson,* however, the court granted relief because the county sheriff or his deputy had *personally selected* the list of prospective jurors for the trial. *See Thomp-*

*son,* 661 F.2d at 105; *Henson,* 634 F.2d at 1081. The prosecutor's mere solicitation of input from others regarding the venire, in the absence of other factors such as a venireperson's knowledge of the activity, does not violate principles of due process.[22]

## IV.

Mills alleges that the prosecution disregarded the instruction of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by withholding exculpatory evidence that could have been used to challenge Fredrick on cross-examination and impeach his credibility. Mills also asserts that the prosecution introduced "false and misleading" evidence at trial. We address these closely related claims together.

■ A prosecutor has a duty to provide a defendant with all material evidence in the State's possession favorable to the accused. *Brady,* 373 U.S. at 87, 83 S.Ct. at 1196–97. "When the defendant's guilt or innocence may turn on the reliability of a witness, the prosecutor's nondisclosure of the evidence affecting the credibility of this witness falls within this general rule." *Alderman v. Zant,* 22 F.3d 1541, 1553–54 (11th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 673, 130 L.Ed.2d 606 (1995). A defendant seeking to establish a *Brady* violation must prove:

> "(1) that the government possessed evidence favorable to the defendant (including impeachment evidence); (2) that the defendant does not possess the evidence nor could he obtain it himself with any reasonable diligence; (3) that the prosecution suppressed the favorable evidence; and (4) that had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceedings would have been different."

*United States v. Spagnoulo,* 960 F.2d 990, 994 (11th Cir.1992) (quoting *United States v. Meros,* 866 F.2d 1304, 1308 (11th Cir.) (per

---

**22.** Mills also urges that we consider this conduct as one of the circumstances to be included in the "totality of the circumstances" that rendered Mills' trial fundamentally unfair. Because we find that the conduct did not, standing alone, deny Mills his right to due process of law, the conduct provides no additional support to Mills' argument that he received a fundamentally unfair trial.

curiam), *cert. denied,* 493 U.S. 932, 110 S.Ct. 322, 107 L.Ed.2d 312 (1989)).

Mills points to several pieces of evidence that, in his view, *Brady* required the prosecutor produce because they could have been used to impeach Fredrick,[23] Galimore, or both. We address each claim in turn.

### A.

■ Mills claims that the State withheld from the defense Fredrick's statement to a law enforcement officer in 1980 that he had "ripped off a .357 to blow somebody away." This information is contained in an "Incident Report–Narrative Form" completed by Sergeant Roxie Vause of the Wakulla County Sheriff's Office on March 28; 1980. Sergeant Vause completed the Incident Report, along with an "Offense Report" and an "Arrest Ticket" for Fredrick, during his investigation of Fredrick's alleged burglary of a residence.[24]

Mills argues here, as in his Rule 3.850 motion, that Mills could have used the statement to support his theory that Fredrick was a violent man capable of killing Lawhon himself. Mills claims that this would support his theory that Fredrick, not Mills, shot Lawhon. The district court concluded that the information is not material because it is not excul-

patory. We agree. The evidence is neither directly exculpatory, nor does it relate to Fredrick's credibility. We note in passing that the information contained in the report was of dubious admissibility, *see Delap v. Dugger,* 890 F.2d 285, 299 (11th Cir.1989) (holding that suppressed evidence is not material when its admissibility at trial is uncertain), *cert. denied,* 496 U.S. 929, 110 S.Ct. 2628, 110 L.Ed.2d 648 (1990); moreover, we fail to charge the prosecutor with surmising that Mills might have been interested in information of such dubious relevance.[25]

### B.

■ Mills contends that the prosecution should have disclosed that, two days before he was questioned about the Lawhon murder, Fredrick "talked his way out of charges for possession of stolen property by placing the blame on someone else." The incident Mills refers to occurred on March 31; in a case unrelated to the Lawhon matter, officers of the Tallahassee Police Department questioned Fredrick and another suspect, Anthony Sharp, about some stolen jewelry.

The information Mills claims was suppressed is contained in the deposition of Gary Lassiter, an investigator for the Tallahassee Police Department.[26] Lassiter testified that,

23. Fredrick, a four-time convicted felon who had lied repeatedly to the police before fully confessing to his role in the Lawhon murder, was the State's key witness. There were no eyewitnesses to the crimes, and the physical evidence and expert opinion testimony the prosecution presented merely corroborated Fredrick's story about the killing. Without Fredrick's testimony, the State's case was purely circumstantial: Mills' truck had been seen near the Lawhons' residence on the day of the murder, Mills possessed stolen property from the Lawhon trailer, and Mills made statements to Galimore indicating that he knew the property had been stolen. In obtaining Mills' conviction, the prosecutor convinced the jury to accept Fredrick's testimony rather than Mills'.

24. The victims of the burglary reported that someone had stolen a 12–gauge, single-barrel shotgun with "TB" carved on the stock and a checkbook from their home. Vause's report states that "Fredrick said the spoons were taken approx. 2 yrs. ago when he 'ripped off a .357 to blow somebody away.'" Fredrick admitted that he had stolen the checkbook and had cashed some checks. Randolph deposed Sergeant Vause prior to trial but did not question him

regarding any previous involvement with Fredrick.

25. Mills also claims that the State should have disclosed that "Fredrick had been questioned as a suspect in a burglary involving a '12 Ga. Sgl. Brl. Shotgun 'TB' on stock,'" as indicated in the Offense Report from the March 1980 investigation. Fredrick testified at trial that he had given Mills a 12–gauge, single-barrel shotgun with "TB" carved on the stock in partial payment of a $175 debt Fredrick owed Mills; Fredrick testified that he had received the shotgun from his mother. Mills asserts that he could have used this information to attack Fredrick's credibility by establishing that Fredrick had in fact acquired the shotgun during a burglary rather than from his mother. Although Mills raised a claim based on the statement regarding the .357 revolver before the district court, he did not raise a claim based on this statement. Because the argument was not presented below, we do not address it.

26. The deposition, which was taken before Fredrick chose to plead guilty to second-degree murder and to testify against Mills, was scheduled by Fredrick's lawyer; Randolph attended the entire deposition and thoroughly examined Lassiter.

upon being questioned, both Fredrick and Sharp initially denied that the jewelry had been stolen, but that Fredrick later told police that Sharp had stolen the jewelry. When confronted with Fredrick's story, Sharp confessed to the theft; there was no evidence that Fredrick had committed a crime. Mills' defense attorney, Randolph, attended the deposition and was present when Lassiter made these statements; the information cannot form the basis of a *Brady* claim because Mills' counsel knew about it well before Mills' trial began.

### C.

██ Mills claims that the State: (1) used threats and other coercive tactics to induce Fredrick to confess to the crimes, to implicate Mills, and to testify against Mills; and (2) fabricated a version of events from Fredrick's many conflicting stories and made Fredrick testify that the constructed version was true. For instance, Mills alleges that police told Fredrick that Mills was their target and that Fredrick would not be charged if he would testify against Mills; if he refused, however, he would go to the electric chair. Fredrick allegedly acquiesced in the face of these tactics and implicated Mills. As proof that the prosecution team engaged in these tactics, and that Fredrick responded accordingly, Mills attached to his Rule 3.850 motion the affidavits of Fredrick, Willie Mae Gavin (Fredrick's mother), and Jessie Sampson (Fredrick's cellmate in the Wakulla County jail at the time Fredrick was being questioned). Fredrick's affidavit, which was prepared by an attorney from the Office of the Capital Collateral Representative ("CCR"), relates the tactics and coercion Mills' petition alleged.[27] Sampson's affidavit states that Fredrick said he was concerned that if he refused to cooperate and implicate Mills, he would get the death penalty; if he cooperated, "they would let [him] go." Gavin's affidavit states that Al Gandy, an investigator from the state attorney's office, told her that "if Mike didn't tell the truth of what happened, Mike would be the one to get the chair instead of ... Mills and [Mills] would go scot free. However, if Mike would tell them what they needed to know about ... Mills' involvement, Mike would get off easy."

The Rule 3.850 court held an evidentiary hearing on this claim at which Fredrick testified. Fredrick admitted signing his affidavit but said that he had not read it until the morning of the hearing.[28] Fredrick testified that the statements in the affidavit—to the effect that the prosecution team had coerced his confession and his implication of Mills with threats and promises—were not true. In short, under oath Fredrick stood by the testimony he gave at trial.

As an exhibit accompanying his federal habeas petition, Mills presented a second affidavit by Fredrick—which was also prepared by a CCR attorney—in which Fredrick

---

**27.** In this affidavit, Fredrick stated:

13. [On May 8, 1982,] after the body was found in the woods, I made a taped statement with Gandy and Ray Fredericks. I was still telling different stories that didn't all add up. They would turn the tape recorder on and off. They also told me what they wanted me to say and made gestures with their hands to lead me on to say certain things. For example, they would hold up a number on their fingers for the number of days they wanted me to say or make a gesture of a camper top when they wanted me to describe a particular truck.

14. They made me say I had led them to the Lawhon trailer driving around but it was really them who took me there.

15. At the end of the statement when they asked me whether they had promised or threatened anything, they were shaking their heads no at me letting me know I should answer "no." The truth is that they had promised me I would not be in any trouble and that I wouldn't do "nary a day of time" if I cooperated with them. Otherwise they said I would go to the electric chair.

**28.** The evening before the Rule 3.850 hearing, Fredrick asked to see Tim Harley, one of the assistant state attorneys who tried Mills' case. Harley testified at the 3.850 hearing that another assistant state attorney requested that Fredrick be escorted to their office. Once Fredrick arrived, Harley and the other assistant attorney questioned Fredrick about his affidavit. Harley gave Fredrick a copy of his affidavit, showed him a single page from the Rule 3.850 petition, and asked Fredrick about portions of his affidavit that Harley thought were untrue. Fredrick told Harley that he wished to speak to the CCR attorney, James C. Lohman, who prepared the affidavit. Harley and the other assistant talked to Fredrick again the morning of the hearing, apparently after Fredrick had spoken to Lohman.

states that he lied at the Rule 3.850 evidentiary hearing when he recanted his first affidavit. Fredrick further states in this second affidavit that he lied because he thought CCR had double crossed him by describing him as a "killer" in Mills' Rule 3.850 petition.

The Rule 3.850 court found "a total lack of any competent evidence that [Fredrick] was threatened, coerced or secretly induced to testify for the State." *State v. Mills*, slip op. at 6. The court specifically found that Fredrick's testimony at the Rule 3.850 evidentiary hearing recanting his first affidavit was credible and, furthermore, was corroborated by Gandy's testimony. The court found no evidence of any agreement between Frederick and the state attorney beyond the agreement to reduce the murder charge that was announced in open court. The Supreme Court of Florida summarily affirmed. *Mills II*, 507 So.2d at 605. The district court likewise found no credible evidence of threats or promises to Fredrick beyond the exchange of his testimony for a reduced murder charge, which was both known by Mills' trial counsel and revealed to the jury. We also agree that Mills has produced no credible evidence suggesting that Fredrick was threatened, coerced, or secretly induced to testify for the State.

### D.

 Mills contends that the prosecution: (1) should have revealed that Fredrick made statements to the police after May 8, the date of his taped confession, that contradicted his May 8 statement; and (2) argued falsely to the jury that Fredrick decided to tell the

truth on May 8 although the prosecution knew that Fredrick had subsequently recanted portions of his May 8 statement. Mills does not indicate when Fredrick made these contradictory statements or their content. Rather, Mills simply argues that Fredrick's attempts to speak with certain police officers after May 8 establishes that his May 8 statement was untrue and that he wanted to change his story. Mills contends that the pretrial deposition testimony of Charles Landrum, Chief Deputy of the Wakulla County Sheriff's Office, corroborates this theory.

The Rule 3.850 court found that Fredrick did not make any inconsistent statements to the State about the Lawhon murder after May 8, 1982. The district court also found no credible evidence to indicate that Fredrick had deviated from his May 8 statement, noting that Landrum's deposition could fairly be interpreted to show that Fredrick did not deviate from his May 8 statement. We agree.[29]

### E.

 Mills contends that the prosecution should have informed the defense that, prior to trial, it prepared typed "scripts" of the testimony Fredrick and Galimore were to present to the jury on direct examination. According to Mills, these scripts contained the questions the witnesses were to be asked and the answers they were to give in response and were given to Fredrick and Galimore to study before they took the stand. Then, before they were called to testify, the prosecution thoroughly "rehearsed" them.[30]

29. Landrum stated in his deposition that he had talked with Fredrick approximately five times after May 8 and that "[Fredrick has] been consistent, I would say, from the first time I have talked to him." Fredrick recounted to Landrum his participation in the murder. Specifically, Landrum testified at his deposition that Fredrick told him that: (1) Mills knocked on the door of the Landrum trailer, went in, and came out to motion Fredrick into the trailer; (2) Mills was on the phone when Fredrick entered; (3) Mills grabbed a knife and held it to Lawhon's throat; (4) Mills told Fredrick to go outside and then came out with a gun to Lawhon's head; (5) Mills told Fredrick to drive and Fredrick did; (6) Mills held the gun to Lawhon's head and told Fredrick where to go; (7) Mills hit Lawhon on the back of

the head; (8) Lawhon fled; and (9) Mills pursued Lawhon and Fredrick heard two shots. Landrum's rendition of Fredrick's post-May 8 statements is consistent with Fredrick's May 8 statement and his testimony at trial.

Additionally, we note that Randolph attended Landrum's deposition and examined him; if Landrum's statement could be interpreted as demonstrating that Fredrick had deviated from his May 8 statement, Randolph would have had full knowledge of that fact well before Mills' trial. Thus, no *Brady* violation exists.

30. Mills also argues that the prosecution coached Galimore to call Mills "Ans Serene," his Muslim name, and should have revealed that Galimore

The lead prosecutor testified at the Rule 3.850 hearing that the answers appearing in the scripts, which were usually one- or two-word prompts, marked important topics that he wanted to ensure were covered. He also testified that the answers were obtained from Fredrick and Galimore. Mills alleges that he would have used the scripts to impeach Fredrick and Galimore and to convince the jury that their testimony sounded convincing merely because they were well rehearsed and had been told what to say.

The Rule 3.850 court found that the lists of questions did not constitute "scripts" and that the prosecution had done nothing improper by using the lists and not disclosing them to Mills. The Supreme Court of Florida addressed this claim at length, finding that the lists of questions were not improper "scripts." *Mills II*, 507 So.2d at 603–05. The district court agreed with the findings of the Rule 3.850 court and the supreme court. We also agree that the prosecution's use of these lists was not improper and that the lists are not *Brady* material.[31]

### F.

■ Mills argues that the prosecution: (1) concealed a secret deal made with Galimore to obtain her testimony, *see Giglio v. United States*, 405 U.S. 150, 154–55, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972) (holding that promises made by the prosecution to a witness in exchange for that witness' testimony relate directly to the credibility of the witness); and (2) allowed Galimore to testify falsely that she had no deal with the State.

The lead prosecutor testified at the Rule 3.850 hearing that Anthony L. Bajoczky, Galimore's attorney, "came to me and said we didn't have a case and she was going to testify. And I said, 'You're probably right.

It is a very weak case and that we will probably nolle prosse [sic] it.'" The prosecutor testified that he did not know what would have happened had Galimore refused to testify. Mills points to an affidavit Bajoczky executed for the prosecution prior to his trial as proof that a secret deal existed between Galimore and the State. In that affidavit, Bajoczky stated:

4. It is my opinion and I am hopeful that if Fawndretta Galimore does testify truthfully as to her knowledge in the case of State of Florida v. John Mills, Jr., ... the State Attorney's Office will dismiss the charges presently against her....

5. I have encouraged Fawndretta Galimore to cooperate with law enforcement in their investigation, but I have *not* at any time informed Fawndretta Galimore that all charges against her would be dropped if she agreed to and did, in fact, testify.

The Rule 3.850 court found "no credible evidence of any kind of ... undisclosed agreement for testimony between the State and Miss Galimore." *State v. Mills*, slip op. at 4. The district court also found no evidence of a deal. Nor do we. *See Alderman*, 22 F.3d at 1555 ("The simple belief by a defense attorney that his client may be in a better position to negotiate a reduced penalty should he testify against a codefendant is not an agreement within the purview of *Giglio*.").[32]

### G.

■ Mills argues that the prosecution should have notified the defense that Fredrick had been placed under psychiatric care and had been given medication for depression after he attempted suicide while incarcerated before Mills' trial. Mills contends that, had he possessed this information, he could have impeached Fredrick's testimony during trial because Fredrick denied on

---

usually referred to Mills as "Boone" rather than "Ans Serene." We find the claim to be frivolous. Not only is the issue irrelevant to Mills' guilt or innocence, but Galimore testified in her pretrial deposition that she commonly referred to Mills as "Ans Serene."

**31.** Randolph testified at the Rule 3.850 evidentiary hearing that he expected the State to prepare its witnesses. He testified that, although he had never given a list of questions with some answers

to a witness to study, he regularly reviewed testimony with important witnesses. He was not surprised that the State had used lists of questions although he acknowledged that he would have used the lists for impeachment purposes had he known of them.

**32.** Mills argues that the fact that Bajoczky slightly edited paragraph four of the affidavit before signing it is significant. We disagree.

cross-examination that he had been under psychiatric care.

At the Rule 3.850 hearing, Mills introduced health records from the Wakulla County jail, which contain a detailed log of all medication given to Fredrick during his incarceration there, and Fredrick's patient records from the Appalachee Community Health Services ("ACHS"), a private organization that provides psychiatric services to prison inmates. The State called Linda Frazier–Williams of ACHS, a registered nurse who treated Fredrick while he was being held, to explain the circumstances of Fredrick's treatment and the medical significance of his prescription. Frazier–Williams testified that Fredrick became severely depressed and attempted suicide on May 26. Upon learning of the suicide attempt, the jail officials called ACHS to perform an emergency service assessment. During the emergency service assessment, a social worker interviewed Fredrick and recommended that he see a doctor. The doctor prescribed Sinequan—an antidepressant also known as Adapin—for Fredrick's sleeplessness, anxiety, and suicidal tendencies and ordered that Fredrick be returned to the jail. ACHS staff met with Fredrick three more times—June 7, June 14, and June 21—to assess his mental state and monitor his behavior. Fredrick displayed appropriate behavior and denied having suicidal thoughts during these follow-up visits. On July 12, Fredrick informed ACHS through jail personnel that he had stopped taking his prescription and did not wish to see any more counselors. Because Fredrick displayed no further indications of depression or suicidal tendencies, ACHS canceled his prescription and discontinued all contact with him. These events concluded more than four months before Mills' trial began on November 29.

Randolph testified that, as former counsel for ACHS, he knew that ACHS treatment records were confidential and would have been unavailable to both the State and the defense without a court order.[33] The jail records, on the other hand, were available on demand by either counsel. After deposing Fredrick on two separate occasions, Randolph knew prior to trial that Fredrick had attempted suicide and had received psychiatric care, but he did not know that Fredrick had taken prescription medication. In any event, Randolph's strategy was to paint Fredrick as a cold, calculating, compulsive liar, not as a mentally unstable individual; thus, impeachment based on evidence of psychiatric treatment would not have contributed to his attack on Fredrick's credibility beyond forming the basis of a possible alternate strategy.[34]

The Rule 3.850 court found that the ACHS records were unavailable to either side and that the jail records were available upon request; thus, the court concluded that "this information regarding medication was not in exclusive possession and control of the State." *State v. Mills,* slip op. at 2. The court also found that Randolph's trial strategy was not based upon the impeachment of Fredrick on psychiatric grounds. These findings were upheld on appeal. *Mills II,* 507 So.2d at 603–05. The district court found that Randolph had full access to this information because he deposed Fredrick twice before trial and the jail records were available on request. We agree that the information is not *Brady* material because it was available to defense counsel and there is no reasonable probability that the evidence would have resulted in a different outcome in light of counsel's admitted strategy.

## H.

Mills also claims the State allowed false testimony to be presented to the jury and argued "what it knew to be false." Specifically, Mills alleges that the State: (1) argued to the jury that Fredrick and Gali-

33. The Hospital exhibits provided to the district court by CCR were stamped "confidential."

34. At the Rule 3.850 hearing, Randolph testified as follows:

[Randolph:] I just feel that I had an impression that he [Fredrick] was just distraught, it was a one-time situation and they had a doctor come down. He tried to commit suicide. They had a doctor who came down. And that's one reason ... why I didn't pursue it.

[Question by State:] That wouldn't have any great significance; would it?

[Randolph:] No, not from what I was looking for, no.

more had not been coached when they had actually been coached extensively; (2) allowed Fredrick to testify falsely that he had not received psychiatric treatment after January 1982; (3) coached Fredrick to omit from his testimony the fact that he had retrieved the murder weapon from the bedroom of the Lawhons' trailer and had given it to Mills; and (4) admitted to the judge that Galimore had lied in her testimony but argued to the jury in closing that she was simply confused about certain details.

The Rule 3.850 court found as a matter of fact that there was no evidence that the prosecution placed false testimony before the jury; the Florida Supreme Court agreed. *Mills II*, 507 So.2d at 604–05. The Rule 3.850 court's finding of fact as to this claim is entitled to a presumption of correctness. *See* 28 U.S.C. § 2254(d); *Marshall v. Lonberger*, 459 U.S. 422, 432, 103 S.Ct. 843, 849–50, 74 L.Ed.2d 646 (1983); *Sumner v. Mata*, 455 U.S. 591, 597, 102 S.Ct. 1303, 1306–07, 71 L.Ed.2d 480 (1982) (per curiam). We conclude, after an independent review of the record, that the record fairly supports this factual finding.

## V.

Mills argues that Randolph [35] rendered ineffective assistance of counsel when he failed: (1) adequately to investigate, for impeachment purposes, Fredrick's background and the psychiatric treatment he received at the Wakulla County jail while detained pending Mills' trial; and (2) adequately to investigate and present mitigating evidence during the sentencing phase of Mills' trial.

 To prevail on a claim of ineffective assistance of counsel, Mills bears the burden of establishing by a preponderance of the evidence that his attorney's performance was deficient and that he was prejudiced by the inadequate performance. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). To establish deficient performance, Mills must

prov[e] that his counsel's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy. The reasonableness of counsel's performance is to be evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances, and the standard of review is highly deferential.

*Kimmelman v. Morrison*, 477 U.S. 365, 381, 106 S.Ct. 2574, 2586, 91 L.Ed.2d 305 (1986) (citations omitted). To establish prejudice, Mills "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068. This standard of effectiveness applies equally to both the guilt and the sentencing phases of the trial. *King v. Strickland*, 748 F.2d 1462, 1463 (11th Cir.1984) (citing *Strickland*, 466 U.S. at 686–87, 104 S.Ct. at 2064), *cert. denied*, 471 U.S. 1016, 105 S.Ct. 2020, 85 L.Ed.2d 301 (1985).

At the outset, we note that Randolph is, and was at the time of Mills' trial, an able and experienced criminal trial attorney. Randolph joined the state attorney's office as an assistant state attorney in Leon County, Florida in 1974 after graduating from the Florida State University School of Law. He handled approximately seventy-five jury trials for the office between 1974 and 1977. Working with another assistant state attorney, Randolph prosecuted three first-degree murder cases, one of which was a capital case. He left the office in 1977 and entered into private practice in Leon, Wakulla, and Gadsden Counties; criminal cases made up about seventy percent of his caseload. Between 1977 and 1982, Randolph went to trial six or seven times per year. He tried two first-degree murder cases as a defense attorney and handled a third that resulted in a plea bargain. In addition to this trial experience, Randolph taught at the Florida State law school as an adjunct professor for three years and taught a Continuing Legal Edu-

---

**35.** Randolph testified at the Rule 3.850 evidentiary hearing that, although another attorney joined him at counsel table during trial and questioned one minor witness (from a question sheet prepared by Randolph), the attorney did not provide any additional assistance to him.

cation course on criminal law for the Young Lawyers' Section of the Florida Bar. Randolph also practiced extensively in Wakulla County.

## A.

■ Mills first argues that Randolph failed to investigate adequately Fredrick's background and the psychiatric treatment he received while he was detained in the Wakulla County jail pending Mills' trial. Mills raised this claim in his Rule 3.850 petition; the state trial court failed to address the claim. Because Mills had properly raised the claim in state court, the district court addressed the claim on the merits and, following an evidentiary hearing, concluded that Randolph's decision to curtail his investigation of Fredrick's psychiatric treatment constituted effective assistance in light of Randolph's trial strategy. We agree.

Randolph deposed Fredrick twice. He knew that Fredrick had attempted suicide and had received psychiatric treatment while in jail, knew of Fredrick's prior cocaine and marijuana use, and knew that Fredrick used cocaine on the day of the murder. Although Randolph brought out some of this information during his cross examination of Fredrick, the thrust of his strategy was to attack Fredrick's credibility, not his mental stability. Randolph felt that Fredrick "came across as a very intelligent person" in his depositions and that the jury would not believe that "Fredrick was a psychotic person who just made up the whole thing out of midair." His intent was to show that Fredrick "was a chronic liar and a probable murderer" and to cast doubt on his testimony. Thus,

Fredrick's suicide attempt and its accompanying treatment were not "something in my mind, in light of the trial strategy that I had developed, that would have been that significant in developing cross examination of Fredrick."

■ "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland,* 466 U.S. at 691, 104 S.Ct. at 2066; *see also Wiley v. Wainwright,* 793 F.2d 1190, 1194 (11th Cir.1986) (per curiam). At some point in his trial preparation, and based on this overall strategy, Randolph made a decision to curtail any further investigation into Fredrick's psychiatric treatment. A decision to limit investigation is " 'accorded a strong presumption of reasonableness.' " *Armstrong v. Dugger,* 833 F.2d 1430, 1433 (11th Cir.1987) (quoting *Mitchell v. Kemp,* 762 F.2d 886, 889 (11th Cir.1985), *cert. denied,* 483 U.S. 1026, 107 S.Ct. 3248, 97 L.Ed.2d 774 (1987)). Randolph was not required to " 'pursue every path until it [bore] fruit or until all available hope whither[ed].' " *Foster v. Dugger,* 823 F.2d 402, 405 (11th Cir.1987) (quoting *Solomon v. Kemp,* 735 F.2d 395, 402 (11th Cir.1984), *cert. denied,* 469 U.S. 1181, 105 S.Ct. 940, 83 L.Ed.2d 952 (1985)), *cert. denied,* 487 U.S. 1241, 108 S.Ct. 2915, 101 L.Ed.2d 946 (1988). Mills has failed to demonstrate that Randolph's performance fell below the standard of reasonably effective assistance.[36]

## B.

Mills urged in his habeas petition that Randolph rendered constitutionally inade-

---

**36.** Mills also argues that Randolph was ineffective for failing to: (1) impeach Fredrick regarding Officer Lassiter's ambiguous response to Fredrick's request that Lassiter help him enlist in the army when Mills' case was over; (2) point out two discrepancies between Fredrick's taped statement of May 8 and his testimony at trial; (3) examine Fredrick regarding his involvement with Sharp and his claim that Sharp was responsible for the theft the Tallahassee police were investigating; and (4) introduce the alleged requirement of Fredrick's plea agreement that his testimony be "in conformance with" his taped statement of May 8. These four matters are inconsequential. Randolph was not ineffective in failing to bring them before the jury; moreover, had he

done so, the outcome of the trial would not have been affected.

Finally, Mills argues that Randolph was ineffective in failing to: (1) produce witnesses to testify that Fredrick had a poor reputation for truth and veracity when such witnesses were available; (2) impeach Fredrick's erroneous testimony that he had not received any psychiatric treatment; (3) attack Fredrick's testimony regarding Mills' statements about white people. Randolph's testimony in the district court revealed that his decision to forego each of these actions was an informed, educated, tactical choice; each choice was, in our view, quite reasonable.

quate assistance by failing to investigate, and present evidence of, mitigating circumstances during the sentencing phase of the case. Mills contends in this court that the district court erred in refusing to hold an evidentiary hearing during which he would have presented testimony from a psychologist, an expert on oral life histories, and an expert on religion concerning his background, religious beliefs, and lack of animosity toward white people. We first address whether the district court erred in refusing to hold an evidentiary hearing on this claim.

### 1.

The district court denied Mills' claim without holding an evidentiary hearing, relying instead on Randolph's testimony presented in the Rule 3.850 proceeding during which he outlined his sentencing phase strategy. Mills contends that the state court's findings of fact on this aspect of his ineffective assistance claim are not entitled to a presumption of correctness under 28 U.S.C. § 2254(d) because the court did not allow the three expert witnesses to speak with Mills before their planned testimony. Mills argues, in effect, that "the material facts were not adequately developed at the State court hearing." 28 U.S.C. § 2254(d); *see also Townsend v. Sain,* 372 U.S. 293, 313, 83 S.Ct. 745, 757, 9 L.Ed.2d 770 (1963) (identifying six circumstances in which a federal habeas court must hold an evidentiary hearing).[37] A petitioner seeking a federal evidentiary hearing based on the inadequate development of a material fact at an earlier state court hearing on the issue must show either: (1) cause for, and prejudice resulting from, such failure; or (2) that a fundamental miscarriage of

justice will result unless a federal evidentiary hearing is held. *Keeney v. Tamayo–Reyes,* 504 U.S. 1, 11–12, 112 S.Ct. 1715, 1721, 118 L.Ed.2d 318 (1992); *see also Weeks v. Jones,* 26 F.3d 1030, 1043 (11th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1258, 131 L.Ed.2d 137 (1995). Mills cannot show cause for, or prejudice resulting from, his failure to develop fully in state court the material facts he sought to introduce in an evidentiary hearing below; nor can he establish the existence of a fundamental miscarriage of justice.

Under Florida law, Mills could have initiated state collateral proceedings under Rule 3.850 any time between July 1, 1985 and July 1, 1987, the two-year period after his conviction and sentence became final.[38] *See* Fla. R.Crim.P. 3.850(b). Instead, Mills did not file a motion for postconviction relief until Tuesday, April 28, 1987, nine days before his scheduled execution.[39] The state trial court held an expedited evidentiary hearing on his motion on Friday, May 1, and Saturday, May 2.

When the hearing began on May 1, Mills' counsel invoked the witness sequestration rule; accordingly, the judge ordered the witnesses to leave the courtroom and not to discuss their testimony with anyone (other than counsel). On the morning of May 2, Mills' attorney sought an order from the judge requiring the officials of the Wakulla County jail to allow three expert witnesses— a psychiatrist, an expert in oral life histories, and an expert on religion—to speak to Mills in the jail where he was being held. Counsel explained that the jail officials had not allowed the three expert witnesses to speak with Mills on May 1 and maintained that

---

**37.** As previously noted, § 2254(d) requires federal habeas courts to accord a presumption of correctness to certain factual determinations made by state courts. *Bundy v. Wainwright,* 808 F.2d 1410, 1415–16 (11th Cir.1987). The § 2254(d) presumption of correctness arises when: (a) a hearing on the merits of a factual issue; (b) is made by a state court of competent jurisdiction; (c) in a proceeding to which the applicant and the state were parties; and (d) is evidenced by a written finding, opinion, or other reliable and adequate written indicia. *Id.* at 1416. As this court has explained, findings of fact that satisfy these four prerequisites are presumed to be correct unless one of eight statutory exceptions applies. *McBride v. Sharpe,* 25 F.3d

962, 971 (11th Cir.) (en banc), *cert. denied,* —— U.S.——, 115 S.Ct. 489, 130 L.Ed.2d 401 (1994); *Bundy,* 808 F.2d at 1416.

**38.** Mills' conviction and sentence became final on July 1, 1985, the date the United States Supreme Court denied his petition for writ of certiorari from his direct appeal to the Supreme Court of Florida. *See Mills v. Florida,* 473 U.S. 911, 105 S.Ct. 3538, 87 L.Ed.2d 661 (1985).

**39.** On March 11, 1987, the Governor of Florida signed a death warrant scheduling Mills' execution for May 7 at 7:00 a.m.

they needed to speak with Mills in order to testify effectively.[40] The State argued that the judge should not allow the three experts to speak to Mills because Mills had invoked the witness sequestration rule. After Mills' attorney identified the expert witnesses, the judge refused to order the prison officials to grant them access to Mills.[41] Later that day, counsel proffered the testimony of the three experts for the record but never called them to the stand.[42]

Mills had nearly two years to prepare his Rule 3.850 petition and to complete any interviews with expert witnesses that might be necessary. If it was necessary for the experts to meet with Mills before testifying, they should have met with him *before* he filed a motion for postconviction relief alleging ineffective assistance of counsel based on the expert witnesses' testimony. Mills offers no explanation whatsoever for his failure to prepare the expert witnesses before the evidentiary hearing began. It also appears that these witnesses could have testified about much of the proffered evidence without

speaking to Mills. Mills does not explain why he did not call them to present the types of evidence that did not rely on information coming from him. Because Mills has not shown cause for, and prejudice resulting from, his failure to develop the material facts before the state tribunal, we affirm the district court's decision not to hold an evidentiary hearing on this issue.

2.

 Turning to the merits of his ineffective assistance of counsel claim, Mills contends that Randolph was ineffective because of his failure to investigate adequately certain mitigating evidence and his failure to present mitigating evidence at the sentencing phase of the trial. Randolph testified at the Rule 3.850 hearing about his investigation of Mills' background as well as his sentencing phase strategy. The Rule 3.850 court concluded that Mills had not demonstrated that he received ineffective assistance of counsel; the Supreme Court of Florida agreed. *Mills II*, 507 So.2d at 603–05.[43] The district court,

**40.** It appears from the record that it is standard procedure to deny death row prisoners visitors during the week before their scheduled execution. Wakulla County jail officials, apparently acting on instructions from state prison officials, began denying Mills visitors on May 1. We note, however, that the court's refusal to allow the experts to see Mills was not based on this policy. Rather, the refusal was based on Mills' invocation of the witness sequestration rule.

**41.** The judge stated that "[t]he Motion on Experts has already been denied. Therefore, the Motion on Experts is still denied." Mills now argues that the judge was confused and was referring to an earlier motion for expert witness fees. Mills' attorney, however, made no effort immediately to clarify this request for the judge or to correct any confusion. Counsel should have done so. In addition, Mills' assertion that the judge was confused is belied by the judge's denial of Mills' renewed motion for access, which was made later in the day.

**42.** One of the experts, Dr. Krop, was a psychologist who had already written a report, which was admitted into evidence at the evidentiary hearing, based on an earlier meeting with Mills.

The second witness, Dr. Jones, an expert on religion, would have offered the following testimony: (1) his opinion that Mills had no racial animus; (2) an explanation of Mills' religious beliefs and the teachings and tenets of the Nation of Islam (including the embracing of non-

violence); (3) his opinion that the use of the term "caucasian" by black people is not unusual or a sign of hostility; (4) his opinion that frequent references to Muslim names would inflame and alienate white southerners; (5) his opinion that the attitudes and relationships of jurors to each other and other members of the community would preclude them from considering a black man convicted of murder in a racially neutral manner; and (6) his opinion that his testimony could assist an all-white jury in analyzing properly Mills' past and his beliefs and render an individualized sentencing determination.

The third witness, Dr. Hall, an expert in oral life histories, would have echoed the testimony of Dr. Jones and added the following opinions: (1) Mills' religious beliefs as a Muslim were positive and therapeutic; (2) Mills had worked diligently to follow a higher moral standard than the one to which he was exposed in prison; (3) a jury could not reach an informed, reliable, and insightful understanding of Mills without taking into account the role of race in his family life, his educational experience, his religious beliefs, his exposure to the criminal justice system, and his day-to-day habits; and (4) the all-white jury in this case could not possibly have recognized and given worth to the individualized life history of Mills without this type of testimony and exposure.

**43.** Because "both the performance and the prejudice components of the ineffectiveness test are mixed questions of fact and law ...[,] a state

after reviewing the record, also concluded that Mills' trial counsel was reasonably effective under the circumstances. We agree with the district court's resolution of this issue.

 Failure to conduct a reasonable investigation into possible mitigating circumstances and to present certain mitigating evidence may render counsel's assistance ineffective. *See Lightbourne v. Dugger,* 829 F.2d 1012, 1025 (11th Cir.1987) (per curiam), *cert. denied,* 488 U.S. 934, 109 S.Ct. 329, 102 L.Ed.2d 346 (1988). Nevertheless, counsel is not required indiscriminately to present evidence:

> In order to determine what evidence might be appropriate, defense counsel has the duty to conduct a reasonable investigation. The failure to conduct any investigation of a defendant's background may fall outside the scope of reasonable professional assistance. After a sufficient investigation, however, "counsel may make a reasonable strategic judgment to present less than all possible available evidence in mitigation." A lawyer's election not to present mitigating evidence is a tactical choice accorded a strong presumption of correctness which is "virtually unchallengeable."

*Id.* (citations omitted) (quoting *Mitchell,* 762 F.2d at 889; *Sinclair v. Wainwright,* 814 F.2d 1516, 1519 (11th Cir.1987)). In addition, "[U]nder some circumstances, an attorney may make a strategic decision not to pursue a particular line of investigation, or to pursue a particular inquiry only so far." *Bolender v. Singletary,* 16 F.3d 1547, 1557 n. 11 (11th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 589, 130 L.Ed.2d 502 (1994). The question is whether failing to present certain mitigating evidence to the jury, or ending an investigation short of exhaustion, was a reasonable tactical decision. "If so, such a choice must be given a strong presumption of correctness, and the inquiry is generally at an end." *Porter v. Singletary,* 14 F.3d 554, 557 (11th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 532, 130 L.Ed.2d 435 (1994).

Randolph called Dr. Na'im Akbar, a psychiatrist, to testify regarding Mills' mental and intellectual faculties. Dr. Akbar testified that, although Mills did not suffer from any mental or emotional disorders, he was at "borderline intelligence level" and had trouble making "good social judgments." Dr. Akbar also testified that Mills, who had converted to Islam while in prison from 1978 to late 1981, had "a jailhouse version of Islam and not the full understanding of it" and began to have hostilities toward whites because of his deficient understanding of the religion. Dr. Akbar further testified that Mills suffered difficulty in understanding people's actions and the "rationale for rules and regulations in society." Finally, Dr. Akbar testified in strong terms that Mills was rehabilitatable. Randolph based his closing argument to the jury on Dr. Akbar's testimony; Randolph contended that Mills could be rehabilitated and urged the jury to consider Mills' impaired abilities as a mitigating circumstance. Randolph also stressed the residual doubt concerning Mills' guilt. Finally, he made a plea for mercy.

Mills argues that Randolph should have introduced evidence regarding Mills' history of childhood abuse, severe substance abuse, serious mental problems, societal rejection, incarceration, and model prisoner behavior.[44] In addition, Mills maintains that Randolph should have addressed directly the issue of

---

court's ultimate conclusions regarding competence and prejudice are not findings of fact binding on the federal court to the extent stated by § 2254(d)...." *Kimmelman,* 477 U.S. at 388-89, 106 S.Ct. at 2590. Subsidiary findings of historical fact and findings that certain decisions by counsel were tactical choices, however, are entitled to a presumption of correctness under § 2254 as questions of fact. *Id.* at 389, 106 S.Ct. at 2590; *Horton v. Zant,* 941 F.2d 1449, 1462 (11th Cir.1991), *cert. denied,* 503 U.S. 952, 112 S.Ct. 1516, 117 L.Ed.2d 652 (1992). Thus, we defer to the state court's findings of fact but apply our own judgment as to whether the conduct constitutes ineffective assistance of counsel.

**44.** Mills contends that Randolph rendered ineffective assistance by failing: (1) to explain the sentencing process to family members during interviews and to ask questions designed to elicit mitigating evidence; (2) to present the testimony of family members during the sentencing phase of the trial; (3) to conduct an adequate investigation into Mills' background; (4) to investigate Mills' school, hospital, and prison records; and (5) to provide sufficient information to Dr. Akbar.

race and Mills' attitudes about it.[45] Mills asserts that Randolph could have done this by: (1) informing the jury that Mills' best friend, who was white, died in a car wreck because Mills was driving while under the influence of drugs and alcohol; and (2) presenting evidence that Mills, who had converted to the Nation of Islam while in prison, had no racial animus and his religious beliefs were positive and therapeutic. Mills alleges that Randolph either did not know about this mitigating evidence, because he did not perform an adequate investigation, or he incompetently failed to present it for reasons unrelated to strategy. The record indicates, however, that Randolph either knew about the suggested mitigating circumstances and elected not to present them for tactical reasons, or chose not to continue investigating certain types of mitigating evidence because they would have been inconsistent with his sentencing phase strategy.

Randolph testified in the Rule 3.850 hearing that he spent a great deal of time talking to Mills' mother and sister about Mills' background. Randolph also spoke with a black community leader about the Mills family and its history. He noted that, although some defense attorneys elect to call family members to the stand in the sentencing phase, he did not choose that strategy in Mills' case. He thought that Mrs. Mills, in particular, would not make a good witness.

Randolph also spoke to a psychiatrist named Dr. Amin who had been instrumental in helping Mills get out of prison. Dr. Amin knew Mills very well and Mills trusted him; Dr. Amin was, according to Randolph, "[t]he man who was in contact with [Mills] constantly, probably more so than what his mother was or his other family members,

because he trusted this man." After discussing Mills' background with Dr. Amin "at length," Randolph chose not to call Dr. Amin to testify because his testimony "may have been prejudicial to what might have been presented. And I just felt after an interview with him that I would not pursue that line of questions." Randolph chose instead to call Dr. Akbar. Randolph further testified that he did not present any evidence explicitly addressing the issue of race because, based on the evidence he had collected, to do so might be harmful to Mills. Thus, Randolph chose to present the testimony of Dr. Akbar and to argue that Mills could be rehabilitated, that the likelihood that Mills would be involved in any future criminal activity was minimal, and that Mills' life should be spared.

After reviewing the record, we hold that Randolph's decision not to present additional mitigating evidence, which he made after a thorough investigation, was reasonable. *See, e.g., Bolender,* 16 F.3d at 1559–60 (collecting cases). We note that evidence of Mills' childhood environment likely would have carried little weight in light of the fact that Mills was twenty-six when he committed the crime, *see id.* at 1561 (finding that evidence of an abusive childhood is entitled to little weight given the fact that the petitioner was twenty-seven years old at the time of the murders), and Randolph made a reasonable choice not to invest large amounts of time investigating that issue. Because the facts Mills sought to develop at an additional evidentiary hearing could not alter our conclusion that Mills' counsel was effective, we agree with the district court's conclusion that an evidentiary hearing is unnecessary. *See Townsend,* 372 U.S. at 312, 83 S.Ct. at 756–57.[46] Furthermore, because of the strong

---

**45.** Mills stresses that he is black, the victim was white, and that the jury learned during the guilt phase that Mills had converted to the Nation of Islam, had referred to whites as "devils," "crackers," and "caucasians," and told the victim before killing him: "I'm going to do to you what your forefathers did to my forefathers." Mills contends that these factors made race a major issue in the trial and that Randolph was ineffective in failing to address the issue.

**46.** Although " '[i]t is well established that a habeas petitioner is entitled to an evidentiary hearing on a claim if *he or she alleges facts that, if proved*

at the hearing, would entitle petitioner to relief,' " *Meeks v. Singletary,* 963 F.2d 316 (11th Cir. 1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1362, 122 L.Ed.2d 741 (1993) (quoting *James v. Singletary,* 957 F.2d 1562, 1573 n. 17 (11th Cir.1992)), an evidentiary hearing is not necessary where the proffered evidence would not affect the resolution of the claim. *See Stephens v. Kemp,* 846 F.2d 642, 650–51 (11th Cir.) (holding that no evidentiary hearing is necessary on an ineffective assistance claim where the evidence petitioner sought to introduce would not affect resolution of

evidence of the aggravating circumstances surrounding the murder, we are convinced that no reasonable probability exists that the jury would have reached a different result had Mills' attorney presented the mitigating evidence allegedly available. In determining whether prejudice exists with respect to the imposition of the death penalty, "the question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent that it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland,* 466 U.S. at 695, 104 S.Ct. at 2069; *see also Funchess v. Wainwright,* 772 F.2d 683, 688, 688–89 (11th Cir.1985) ("[T]o prevail on a claim of ineffective assistance of counsel at the sentencing phase, the appellant 'must show that without the error[s], there is a reasonable probability that "the balance of aggravating and mitigating circumstances did not warrant death." ' " (quoting *King,* 748 F.2d at 1463)), *cert. denied,* 475 U.S. 1031, 106 S.Ct. 1242, 89 L.Ed.2d 349 (1986).

The evidence presented during the guilt and sentencing phases supported five aggravating circumstances which, under Florida law, made Mills eligible for a jury recommendation of death. Two of these aggravating circumstances were virtually incontrovertible: that Mills was under a sentence of imprisonment—he was on parole—at the time of the crime and that the murder was committed in furtherance of a kidnapping. Two others, that the murder was committed in a cold, calculated, or premeditated manner and that it was committed for pecuniary gain, were also well supported by the evidence presented at trial and—quite reasonably in our opinion—Randolph did not dispute their existence in his closing argument to the jury. The fifth circumstance, the atrociousness circumstance, is the only contestable issue. The trial court, after independent review of the evidence, found all five aggravating circumstances present. In sum, the weight of

the aggravating circumstances was overwhelming. In light of this fact, we believe there is no reasonable probability that the evidence that Mills contends should have been presented would have caused the jury to return a life recommendation or the judge to sentence Mills to life imprisonment.

## VI.

■ Mills contends that the prosecutor rendered both the guilt and the sentencing phases of his trial fundamentally unfair by making improper remarks to the jury in closing argument. Mills did not raise these claims in the direct appeal from his convictions and death sentence; rather, he waited until his convictions had become final and he moved the trial court for Rule 3.850 relief. The court dismissed the claims and denied relief because the claims were "not ... cognizable under rule 3.850," *State v. Mills,* slip op. at 6; they were reviewable only on direct appeal. The Supreme Court of Florida agreed. *Mills II,* 507 So.2d at 603.

The district court, accepting the Florida courts' finding that Mills had committed a procedural default by failing to raise the claims on direct appeal and, thus, had precluded the Florida courts from adjudicating the claims on the merits, considered whether Mills had established cause for, and resulting prejudice from, his default.[47] The court concluded that Mills had not done so and therefore held the claims procedurally barred. We reach the same holding.

## A.

Both Mills' Rule 3.850 motion and his subsequent federal habeas petition alleged, under "Claim IX" and "Claim X," that the prosecutor made improper remarks to the jury in the guilt phase as well as the sentencing phase of the trial. These pleadings also alleged that Mills' attorney "unreasonably"

---

the issue), *cert. denied,* 488 U.S. 872, 109 S.Ct. 189, 102 L.Ed.2d 158 (1988).

**47.** Mills has not attempted to establish the "fundamental miscarriage of justice" exception to the

procedural bar. *See Johnson v. Singletary,* 938 F.2d 1166, 1175–76 (11th Cir.1991) (en banc), *cert. denied,* —— U.S. ——, 113 S.Ct. 361, 121 L.Ed.2d 274 (1992).

failed to object to the comments.[48] In the text of his pleadings under both Claim IX and Claim X, Mills asserted that counsel was "ineffective" for failing to object, and, in his brief to this court, Mills has cast the claims as claims of ineffective assistance of counsel. Because Mills originally presented the claims as claims of improper argument, we address them as such and analyze whether the district court properly found the claims barred because Mills failed to demonstrate cause for, and resulting prejudice from, his state court procedural default.[49] We note, however, that Mills' only attempt to establish cause and prejudice is by showing that he received ineffective assistance of counsel; thus, whether he has established cause and preju-

dice with respect to his procedural default depends on whether he has established an ineffective assistance of counsel claim. *See Coleman v. Thompson,* 501 U.S. 722, 753–55, 111 S.Ct. 2546, 2567, 115 L.Ed.2d 640 (1991) ("[C]ounsel's ineffectiveness will constitute cause only if it is an independent constitutional violation.").

### B.

▌ Our examination of the prosecutor's closing argument to the jury in the guilt phase reveals no improprieties; Mills therefore has failed to demonstrate prejudice with respect to his guilt phase claim.[50] Turning to

---

48. Mills stated the following claims in both his Rule 3.850 and federal habeas petition:

CLAIM IX
THE STATE'S ARGUMENT AT GUILT/INNO-CENCE IMPROPERLY INJECTED THE EXPERTISE OF THE PROSECUTOR INTO THE JURY DETERMINATION, WAS IRRELEVANT, INFLAMMATORY, AND PREJUDICIAL, STRESSED IMPROPER AND ILLEGAL INTERPRETATIONS OF THE EVIDENCE, AND WAS DESIGNED TO INFLAME PASSIONS AND RACIAL BIAS, AND TRIAL COUNSEL UNREASONABLY ALLOWED THE TIRADE, IN VIOLATION OF MR. MILLS' FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENT RIGHTS.

. . . .

CLAIM X
THE PROSECUTOR'S CLOSING ARGUMENT AT SENTENCING AND AT GUILT/INNO-CENCE INFECTED THE SENTENCING PROCESS BY IMPERMISSIBLY INJECTING RACE, FEAR, AND THE FORBIDDEN GOLDEN RULE ARGUMENT INTO THE CRITICAL JURY DECISION MAKING PROCESS, AND COUNSEL UNREASONABLY FAILED TO OBJECT, VIOLATING MR. MILLS' FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENT [RIGHTS].
Both the Rule 3.850 court and the district court treated these claims as claims of improper argument and fundamental error rather than ineffective assistance of counsel claims.

49. In its order finding the two claims procedurally barred, the district court summarized the claims as "Claim IX, that the prosecutor made improper arguments based upon racial bias" and "Claim X, that the prosecutor made improper 'golden rule' arguments." Thus, the district court clearly did not consider either claim to be an ineffective assistance of counsel claim. We note that Mills did not move the court to reconsider its classification of the claims and to treat them as alleging ineffective assistance of counsel under the Sixth and Fourteenth Amendments.

50. In finding no improprieties in the prosecutor's guilt phase argument to the jury, we note that Randolph objected only once during that argument. When asked at the evidentiary hearing in the district court why he objected only once, Randolph said that "[y]ou can over object sometimes in a trial and it works against you just as well as continuously objecting to a particular point" and concluded that "if you keep interrupting, sometimes you can do more damage to what you're trying to do. You then allow the jury to focus in and think that this is something that is important, if you made your point already.... I think I made that point the first time around." As a tactical matter, then, Randolph concluded that objecting too often during the prosecution's closing argument in the guilt phase of the trial could have caused the jury to concentrate to Mills' detriment on where the prosecutor was trying to take them. Although the district court did not cite this aspect of Randolph's testimony in finding that the challenged remarks caused Mills no undue prejudice, that point is undisputed. *Cf. Lindsey v. Smith,* 820 F.2d 1137, 1149 n. 17 (11th Cir.1987) (" '[W]e may, where the district court made no findings on matters crucial to the ultimate determination, reach into the record and rely on undisputed facts clearly supported therein.' " (alteration added) (quoting *Jurek v. Estelle,* 623 F.2d 929, 932 (5th Cir.1980) (en banc), *cert. denied,* 450 U.S. 1001, 101 S.Ct. 1709, 68 L.Ed.2d 203 (1981), *and cert. denied,* 450 U.S. 1014, 101 S.Ct. 1724, 68 L.Ed.2d 214 (1981))), *cert. denied,* 489 U.S. 1059, 109 S.Ct. 1327, 103 L.Ed.2d 595 (1989). Assuming that the prosecutor's comments were somehow improper, we conclude Randolph's strategic decision not to object more frequently than he did constituted a tactical decision that was well within the realm of reasonableness. *See Devier,* 3 F.3d at 1454 ("[T]he decision not to object was based on a reasonable strategic choice. The fact that such a stratagem, viewed from hindsight, may have been imprudent does not ... provide the basis for a claim of ineffective assistance of

the prosecutor's argument in the sentencing phase, we find only one portion that merits discussion.[51] As to that portion, we hold that no reasonable probability exists that the outcome of the sentencing phase would have been different had Randolph objected; we therefore do not address the question, posed by the first prong of the *Strickland* test, of the adequacy of Randolph's performance. We base our determination regarding the probable outcome of the sentencing phase on the totality of circumstances surrounding the sentencing phase of the trial. Accordingly, we recount the relevant portions of that phase.

### 1.

As previously discussed, during the sentencing phase the prosecution's case rested primarily on the evidence presented at the guilt stage; Mills' case focused on Dr. Akbar's analysis of Mills' mental and psychological condition and his potential for rehabilitation. During his closing argument, the prosecutor pointed to the presence of the five aggravating circumstances and the absence of certain enumerated mitigating factors. Toward the end of his remarks, the prosecutor made the following remarks:

> The real scary thing about this—and I've alluded to this before—is Les Lawhon is totally innocent in this case. . . . Les Lawhon's only crime in this whole matter is being a compassionate human being who when asked for help, allowed people into his home to use his phone and to help them find out the information they needed. That is the only thing that he did wrong. . . . For that, he received a death sentence from John Mills, Jr., a death sentence.
>
> You know, I sure wi[sh] that when they took that drive out there and they got on that air strip, that Les could have said: Wait a minute. Wait a minute. Let's get

my family doctor. He'll tell you that I'm sick and he'll tell you that I can be better. Something better can be done for me. Let's get my doctor and let him tell you about this. I wish he could have said: Let's go get my lawyer. Lord knows, my lawyer can give a good reason for me to be alive. My lawyer can tell you I can be productive in society; that I can help; that I'm not beyond redemption. My lawyer will do a good job. Please, John Mills. Let's go get my lawyer. Or he could have said: Let my family be here. Let them be here, and let them argue for me, please. Let's get a jury [of] 12 people from Wakulla County and see if I deserve to die like this. See if I deserve to be treated like a mad dog. Please. Let's get that jury. I don't want to die.

> But John Mills, Jr., made another one of those social judgments. He became the jury, the judge, the lawyers, the bailiffs, and the executioner.

Randolph's closing, in response, consisted of four basic themes: a plea for mercy, an argument that stressed residual doubt as to Mills' guilt, an argument that the atrociousness circumstance did not apply, and an argument that urged the jury to consider statutory and nonstatutory mitigating circumstances based in part on Dr. Akbar's testimony. Randolph stated:

> Now, I guess you ask: Well, what did Mr. Lawhon appreciate? That's what the prosecutor was saying. He can't make that choice anymore. Well, that's true. That's true. There is nothing I can say here or that Mr. Kirwin can do to you to bring Les Lawhon back. It just can't be done, but you have a responsibility, not only to this community and yourselves, but to everybody involved in the criminal justice system.

After counsel finished, the court instructed the jury regarding aggravating and mitigat-

counsel."). Mills thus fails to establish cause for, or resulting prejudice from, counsel's state court procedural default.

51. We find that the prosecutor's argument (the portion that we quote in detail *infra* and those portions that do not merit further discussion) was not improper.

ing circumstances. The court repeatedly instructed the jurors that it was their duty to base their verdict only on the evidence presented:

> [I]t is your duty to follow the law which will now be given you by the Court and render to the Court an advisory sentence based upon your determination as to whether sufficient aggravating circumstances exist. To justify the imposition of the death penalty and whether sufficient mitigating circumstances exist to outweigh aggravating circumstances existing, your verdict should be based upon the evidence which you have heard while trying the guilt or innocence of the Defendant and the evidence which has been presented to you in these proceedings.
>
> . . . .
>
> The sentence that you recommend to the Court must be based upon the facts as you find them from the evidence and the law. You should weigh the aggravating circumstances against the mitigating circumstances and your advisory sentence must be based on these considerations.
>
> . . . .
>
> Before you ballot, you should carefully weigh, sift and consider the evidence and all of it. Realize that a human life is at stake and bring to [bear] your best judgment in reaching your advisory sentence.

### 2.

We must determine "whether there is a reasonable probability that, absent the [prosecutor's challenged remarks], the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695, 104 S.Ct. at 2069. The presence of several factors convinces us that the factfinders would have reached the same conclusion had Randolph objected to the prosecutor's challenged comments. First, we note again that the presence of five aggravating circum-

stances in this case makes it highly unlikely that the jury would have decided this case differently. Second, Randolph partially ameliorated the effect of the prosecutor's comments when he addressed them and urged the jury to be cognizant of its responsibility. Finally, the court clearly instructed the jury to base its verdict on the evidence and the law, to weigh the facts, and to be mindful that a life was at stake. After examining the totality of circumstances, we find that the challenged remarks did not affect the jury's exercise of its discretion in recommending life or death. · Cf. *Gates v. Zant*, 863 F.2d 1492, 1503 (11th Cir.) (per curiam) (finding several arguments improper but holding that the sentencing was not rendered fundamentally unfair considering the totality of the circumstances), *cert. denied*, 493 U.S. 945, 110 S.Ct. 353, 107 L.Ed.2d 340 (1989). We hold, therefore, that Randolph's failure to object was not prejudicial and did not constitute ineffective assistance of counsel under *Strickland.* As a result, Mills has failed to overcome the procedural bar to his claim.

### VII.

For the foregoing reasons, we conclude that all of the claims raised by Mills in this appeal relating to his convictions and death sentence are either procedurally barred or without merit. Accordingly, the judgment of the district court denying Mills' petition for a writ of habeas corpus is AFFIRMED.

IT IS SO ORDERED.