925 So.2d 457 (2006)
Talmadge MOORE d/b/a High Standard Services, Appellant,
v.
Jeffrey CHODOROW, Linda Chodorow, Richard Latimer, individually, and Latimer Construction Corporation, Appellees.
No. 4D05-939.
District Court of Appeal of Florida, Fourth District.
April 12, 2006.
*458 Stephen M. Cohen, P.A., and Richard S. Tolbert, West Palm Beach, for appellant.
Lee D. Mackson and Geoffrey L. Travis of Shutts & Bowen LLP, Miami, for appellees.
POLEN, J.
This appeal arises from an Amended Final Judgment, following a three-day bench trial, finding against appellant Talmadge Moore d/b/a High Standard Services (hereinafter "Moore") and in favor of appellees Jeffrey and Linda Chodorow (hereinafter "the Chodorows"), Richard Latimer and Latimer Construction Corporation. We affirm, holding that the trial court did not err in interpreting the contract between the parties and in finding that Moore breached the contract.
Moore sued appellees for breach of contract and unjust enrichment. The Chodorows filed an answer, affirmative defenses, and a counterclaim for fraud and rescission. The Latimer defendants also filed an answer and affirmative defenses. The following evidence was adduced at trial.
The Chodorows own an approximately 8,700 square foot, two floor condominium unit in Aventura, Florida. In July of 2002, the Chodorows discovered a water leak in their condo. They called a contractor, Richard Latimer of Latimer Construction Corp.,[1] to fix the leak. When Latimer cut a hole in the ceiling to investigate the source of the leak, he discovered mold under the drywall. Over time, mold was discovered in other areas as well.
As Latimer did not have any professional experience in dealing with mold, they hired Moore to guide them in the issues relating to mold in the Chodorows' home. Latimer told Moore that he did not have *459 any professional experience in dealing with mold. Moore held himself out to be an expert in mold remediation and in the field of dealing with mold problems.[2] Moore testified that he was aware that the Chodorows were relying on him to test for mold and to recommend solutions to their mold problem.
Moore visited the Chodorows' home on July 9, 2002, and took some air samples around the home and the outdoor environment, which he sent out to a lab for analysis. Moore also took initial humidity readings showing over 60 percent humidity, which would sustain mold growth. Moore told them that they had a serious mold problem in the house and that if it was his family, he would move out immediately, which they did. Moore also recommended that the Chodorows rent air scrubbers and dehumidifiers from him.
On July 11, 2002, Moore faxed a contract to Latimer for the rental of two air scrubbers and two dehumidifiers at a total cost of $420 a day. The contract, which was prepared by Moore specifically for the Chodorows, states "[t]hese machines are needed to control further damage caused by airborne mold." Moore also orally told both Mr. Chodorow and Latimer that the machines were needed to control an existing airborne mold problem in the Chodorows' condo. Also on July 11, 2002, Moore faxed Latimer a hand-written letter stating that the equipment would be monitored one or two times a day by a Moore employee. Moore also charged the Chodorows a daily charge to change the filters. The Chodorows paid Moore for the first ten days that the equipment was at the condominium.
According to both Moore and the expert witnesses at trial, there is always some level of mold naturally present in the air, but the amount of airborne mold is not problematic inside a home unless the level is higher inside the home than in the outside air. The only way to determine whether there are mold spores in the air is to test the air, as mold spores are too small to be seen by the human eye.
On or about July 16, 2002, Moore received the lab results of the air samples that he took at the Chodorows' home on July 9, 2002. The lab results established that there were approximately 2.5 times more mold spores in the outdoor air than inside the Chodorows' home on July 9, 2002, the day that he had told the Chodorows that they had an airborne mold problem.
Moore did not tell the Chodorows that the lab test results showed that there was less overall airborne mold inside their home than in the outside air. Instead, Moore reinforced his false representation that the Chodorows had unacceptably high levels of airborne toxic molds in their home in his October 10, 2002 report, discussing "the cause of the amplified levels of airborne toxic molds." Moore left the equipment in the Chodorows' home for 300 days, at a charge of $420 per day.
Moore admitted at trial that he did not perform a single test during the 300 days that the equipment was in the Chodorow's home that showed that the level of mold spores inside the home was greater than the level in the outside air. He did not perform a single test that showed that the air scrubbers had any effect on the air quality in the Chodorows' home, or that the contents of the Chodorows' home would have been damaged absent either the air scrubbers or the dehumidifiers. During the entire period that the equipment was in the Chodorows' home, Moore did not perform a single test of the air in the Chodorows' home in comparison to the outside air.
*460 The Chodorows began to doubt Moore's expertise by October of 2002 and initiated attempts to hire a new remediator. Dr. Ronald Huggins of URS Corporation inspected the Chodorows' home in March or April of 2003.[3]
When Dr. Huggins inspected the Chodorows' home in March or April of 2003, Moore's equipment was still set up in the home. Upon Huggins' first visit to the home, he inquired as to what the equipment was for, as he saw no need for it. On Huggins' second visit to the Chodorows' home in May of 2003, Huggins stated that the equipment should be removed because it was not serving any useful purpose. As a result, the Chodorows told Moore to remove the equipment, which he did on May 7, 2003.
In June of 2003, approximately six weeks after the equipment was removed, Dr. Huggins tested the air inside the Chodorows' home and compared it to the outside air. Those test results established that the air in the Chodorows' home had a lower mold spore count than in the outdoor air, meaning the home did not have an airborne mold problem in June of 2003.
Dr. Huggins also reviewed Moore's July 16, 2002, test results and concluded that the home did not have an airborne mold problem at that time either. Huggins testified that Moore did not perform any tests showing that the equipment was necessary to control airborne mold damage or to protect the Chodorows' furnishings. Huggins testified that the numbers from Moore's July 9, 2002, test results were "really, really low," establishing that the Chodorows did not have an airborne mold problem in their home.
Dr. Huggins also testified that Moore's representation in the contract that the machines were "needed to control further damage caused by airborne mold" and Moore's subsequent representation in his October 10, 2002 report that there were "amplified levels of airborne toxic molds" in the Chodorows' home were false. Moreover, Dr. Huggins testified, even if the Chodorows had an airborne mold problem, the equipment Moore rented to them would have been ineffective because Moore failed to properly monitor and properly place the equipment. Finally, Huggins testified that Moore did not, and could not, inhibit mold growth in the Chodorows' home by attempting to reduce the humidity, as the mold which existed behind and underneath structures in the home was the result of ongoing water intrusion, which would have to be stopped first. Additionally, the Chodorows' air conditioning system was sufficient to reduce humidity levels in the condo.
At trial, Moore relied on his expert witness, Arcade Dugay, who testified that the equipment Moore rented to the Chodorows was necessary.[4]
Following the three-day non-jury trial, the trial court entered the final judgment now being appealed. The court found that Moore materially breached his contract with the Chodorows in three ways: (i) failing to advise them that the equipment *461 was not needed as of July 16, 2002, or, at a minimum, failing to tell them that the testing revealed no airborne mold problem, allowing them to make the decision of whether they wished to continue to rent the equipment; (ii) failing to properly monitor the equipment; and (iii) failing to properly place the equipment. The court held that the Chodorows are relieved from paying any additional rental fee, based on Moore's material breaches.
The trial court also found that the Chodorows owed Moore $2,321 plus pre-judgment interest for repair work they acknowledge Moore did in the master bedroom. The court found that Moore should take nothing by way of his claim against the Latimer defendants. Finally, the court found that the Chodorows should recover nothing against Moore for their counterclaims. Moore appealed.
First, Moore argues that the trial court erred in interpreting the contract between the parties. "Construction of a contract is a question of law which an appellate court may consider de novo provided that the language is clear and unambiguous and free of conflicting inferences." Miller v. Kase, 789 So.2d 1095, 1097 (Fla. 4th DCA 2001). Moore argues that the trial court incorrectly construed the July 9, 2002 contract to mean that the parties intended for the machines to reduce or eliminate existing airborne mold. He contends that it is clear that the parties' real intention regarding the formation of the contract was to reduce the level of moisture in the air and to guard against what might happen with regard to the potential release of mold spores in the air.
We hold that Moore's contention regarding the parties' intention in contracting to rent the equipment is incorrect because it conflicts with the clear language of the contract, which Moore drafted specifically for the Chodorows. The language used in a contract is the best evidence of the intent and meaning of the parties. Jenne v. Church & Tower, Inc., 814 So.2d 522, 524 (Fla. 4th DCA 2002); see also Khosrow Maleki, P.A. v. M.A. Hajianpour, M.D., P.A., 771 So.2d 628 (Fla. 4th DCA 2000) ("It is axiomatic that the clear and unambiguous words of a contract are the best evidence of the intent of the parties. Where contracts are clear and unambiguous, they should be construed as written, and the court can give them no other meaning.") (citations omitted). The handwritten contractual language for the July 9, 2002 contract to rent the air scrubbers and dehumidifiers states "[t]hese machines are needed to control further damage caused by airborne mold."[5] Therefore, we hold that trial court properly construed the contract as written.
Second, Moore argues that the trial court erred in finding that he breached the contract. Whether a party's failure to commit certain actions constitutes a material breach of an agreement is reviewed as a question of fact. Haiman v. Fed. Ins. Co., 798 So.2d 811 (Fla. 4th DCA 2001). Appellate courts "do not, and cannot, reweigh factual findings of trial courts; we only determine if they are legally sufficient to support the judgment." Crooks v. Atl. Nat'l Bank of Fla., 445 So.2d 1042, 1042 (Fla. 5th DCA 1984). Additionally, "[a]s an appellate court, we must disregard conflicting evidence and accept the facts in evidence which are most favorable to the party that prevailed below." Blue Lakes Apartments, Ltd. v. George Gowing, Inc., 464 So.2d 705, 708 (Fla. 4th DCA 1985).
Here, where the trial court relied upon three independent bases for finding that *462 Moore breached the contract, the appellate court may set aside the trial court's decision only if Moore meets his burden of demonstrating that all three of these bases were unsupported by competent, substantial evidence. See Research & Design, Inc. v. Heico Corp., 566 So.2d 290 (Fla. 4th DCA 1990). The court found that Moore materially breached his contract with the Chodorows in three ways: (i) failing to advise them that the equipment was not needed as of July 16, 2002 or, at a minimum, failing to tell them that the testing revealed no airborne mold problem, allowing them to make the decision of whether they wished to continue to rent the equipment; (ii) failing to properly monitor the equipment; and (iii) failing to properly place the equipment. After reviewing the record, we hold that the trial court's findings are supported by competent, substantial evidence.
Based on the foregoing, the Amended Final Judgment is affirmed.
SHAHOOD and TAYLOR, JJ., concur.
NOTES
[1] Latimer is a high-end interior contractor who had performed the interior build-out for the Chodorows when they bought the condo.
[2] Moore is a certified mold remediator and a certified indoor environmentalist. He was not asked and did not testify as to the bases for his certifications.
[3] Dr. Huggins has a B.S. in Biology, an M.S. in Environmental Biology, an M.P.H. in Environmental Health/Industrial Hygiene, and a Ph.D. in Industrial Hygiene/Toxicology. He has an extensive background and career in assessing air quality and evaluating damage due to water intrusion and mold.
[4] Dugay does not have a college degree or a resume. He testified that 0.5% of his work is testing for mold contamination and he relies on industrial hygienists to do mold testing. Dugay stated that he spent approximately one hour reviewing the case at the time of the trial. He never visited the Chodorows' home or saw pictures or videos of the home. He did not review any test results or documents, nor did he conduct any tests, before forming his opinion.
[5] Additionally, there was testimony at trial that Moore also orally told both Mr. Chodorow and Latimer that the machines were needed to control an existing airborne mold problem in the Chodorows' condo.