NOTE:  This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

2009-1327


NISSIM CORP.,

Plaintiff-Appellant,

v.

CLEARPLAY, INC.,

Defendant-Appellee,

and

MATTHEW JARMAN,
LEE JARMAN, and WILLIAM AHO,

Defendants.


John C. Carey, Carey, Rodriquez, Greenberg & Paul, LLP, of Miami, Florida, argued for plaintiff-appellant.  With him on the brief was Allison J. Cammack.

David J. Jordan, Stoel Rives LLP, of Salt Lake City, Utah, argued for defendant-appellee.  With him on the brief was David L. Mortensen.  Of counsel on the brief was Thomas J. Meeks, Carlton Fields, P.A., of Miami, Florida.

Appealed from:  United States District Court for the Southern District of Florida

Judge Paul C. Huck

NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

2009-1327

NISSIM CORP.,

Plaintiff-Appellant,

v.

CLEARPLAY, INC.,

Defendant-Appellee,

and

MATTHEW JARMAN,
LEE JARMAN, and WILLIAM AHO,

Defendants.

Appeal from the United States District Court for the Southern District of Florida in case no. 04-CV-21140, Judge Paul C. Huck.

_____

DECIDED: May 10, 2010
_____

Before GAJARSA, LINN, and MOORE, Circuit Judges.

MOORE, Circuit Judge.

Nissim Corporation (Nissim) appeals from a district court's order denying Nissim's Motion to Enforce Settlement Agreement. Nissim Corp. v. ClearPlay, Inc., No. 04-CV-21140 (S.D. Fla. Mar. 31, 2009) (Order). Because the district court erred in its construction of the terms of the settlement agreement, we vacate and remand.

BACKGROUND

The technology at issue pertains to content-filtering products for DVD movies. The products are a combination of hardware and software that allow users to filter objectionable content (OC) from DVD movies based on the category of OC and the level of explicitness. Nissim's subsidiary, CustomPlay, LLC, developed content coding specifications, the details of which it protects as a confidential trade secret. The CustomPlay OC Specifications (Specifications) provide detailed guidelines and examples relating to the classification of categories and levels of explicitness. Categories of OC include things such as violence, nudity, blasphemy, sex, and vulgarity. There are also three levels of explicitness for each category: implied, explicit, and graphic. The combination of OC categories and levels of explicitness allows the user to tailor its filters: for example, the products allow the user to broadly exclude nudity (implied, explicit, and graphic) but more narrowly exclude only graphic violence. The choice of degree is up to the user, specified through the level of explicitness adopted. Nissim alleges that it had these Specifications developed "with the longstanding goal of establishing an industry standard that would facilitate widespread utilization of objectionable-content control technology." According to Nissim, this technology will only be commercially successful if there is consistent application of the CustomPlay OC Specifications. For example, Nissim argues that if a parent wishes to exclude all substance abuse from a movie their child will watch, the parent will be unhappy if some drug abuse is allowed and will cease to use the technology if the standard is not consistently applied. Reply Br. 15.

ClearPlay develops and sells a combination of hardware and software that allows for OC filtering. Customers who purchase ClearPlay DVD players download individual

software OC maps for each movie and customize the maps by selecting the categories and levels of explicitness to filter. The customized OC map tells the ClearPlay DVD player when to mute or skip over OC based on the user's filter selections.

In May 2004, Nissim sued ClearPlay for infringement of five patents pertaining to technology for the editing of video programs based on content. In November 2005 (five days prior to the start of trial), the parties entered into a Settlement and License Agreement (the Agreement). Nissim granted ClearPlay a license in exchange for, among other things, royalty payments and certain compliance with the CustomPlay Specifications for filtering.

On June 11, 2007, Nissim filed a Motion to Enforce Settlement Agreement, alleging that certain OC maps being sold by ClearPlay violate the Agreement. The present dispute centers on the degree of compliance with the CustomPlay Specifications that is required by the Agreement. Paragraph 1.4 of the Agreement defines "ClearPlay CustomPlay OC Map":

> "ClearPlay CustomPlay OC Map" shall mean a CustomPlay OC Map generated by ClearPlay. A ClearPlay CustomPlay OC Map; i) identifies the beginning frame and the ending frame of video segments that contain possibly objectionable content, and assigns a category and a level of explicitness, using the categories and levels standardized by the CustomPlay OC Specifications; ii) shall not modify, expand, reduce, or combine, content categories, or levels of explicitness specified by the CustomPlay OC Specifications, and; iii) <u>shall be in substantial compliance with the CustomPlay Specifications, it being recognized by the parties that application of the CustomPlay OC Specifications requires flexibility of artistic judgment within the overall goal of maintaining consistency</u>.

J.A. 449 (emphasis added). Nissim alleged that ClearPlay's OC maps were not substantially compliant with the Specifications as required by Paragraph 1.4. With the parties' consent, the district court appointed a Special Master to hear evidence in order to determine whether ClearPlay OC maps satisfy the requirements of the Agreement.

On February 11, 2009, the Special Master filed his Amended Report and Recommendation. <u>Nissim Corp. v. ClearPlay, Inc.</u>, No. 04-CV-21140 (S.D. Fla. Feb. 11, 2009) (<u>Report</u>). The Special Master agreed with ClearPlay's contention that the issue of substantial compliance is whether ClearPlay "has complied with the <u>general intent</u> of the Agreement as a whole, not whether it identified and classified possibly objectionable content in the same way Nissim would have identified and classified the same content." <u>Id.</u> at 11. The Special Master also concluded that "substantial compliance within the context of Paragraph 1.4 is not determined by percentages or numbers." <u>Id.</u> at 14. Instead, the Special Master read the language of Paragraph 1.4 as granting ClearPlay the discretion to depart from the Specifications and still be in substantial compliance as long as ClearPlay exercised its "reasonable 'artistic judgment.'" <u>Id.</u>

With respect to the phrase "flexibility of artistic judgment" as used in Paragraph 1.4, the parties proposed a variety of interpretations. Nissim argued that the phrase relates to determining the timing of "cut in" and "cut out" points on either side of OC in order to create the most seamless transitions possible. ClearPlay argued that the phrase gives it the discretion "to decide whether to code potentially objectionable material when the degree of objectionableness may be outweighed by the material's relevance to the movie." <u>Id.</u> at 13–14. The Special Master concluded that the phrase "flexibility of artistic judgment" unambiguously grants ClearPlay discretion to determine "when to code material that may technically fall within the definitions of the specifications." <u>Id.</u> at 15–16. "In the Special Master's view, substantial compliance within the context of Paragraph 1.4 is not determined by percentages or numbers.

Rather, the plain language of 1.4 allows ClearPlay to depart from the specifications, in exercising reasonable 'artistic judgment,' and still be in substantial compliance with the OC specifications." Id. at 14. Hence, if ClearPlay determines in the exercise of its artistic judgment that it should not exclude otherwise objectionable material because "the degree of objectionableness may be outweighed by the material's relevance to the movie," it is free to include such objectionable content regardless of the level of explicitness selected by the user—and, according to the Special Master, ClearPlay will still be in substantial compliance. After hearing testimony and reviewing evidence relating to selected OC maps released by ClearPlay and viewing all of the selected movies with and without various filters enabled, the Special Master determined that ClearPlay's selected OC maps each substantially complied with the Specifications and, therefore, the Agreement.

The district court found "that the Special Master's conclusions as to the meaning of the relevant provisions of the Settlement and Licensing Agreement are well reasoned, thorough, and in harmony with the Court's de novo review of the contract interpretation issues." In fact, in its order the district court stated that the Special Master's report is "ratified and affirmed." Order at 5. The district court likewise concluded that the Agreement "grants ClearPlay discretion to depart from the CustomPlay Specifications," Order at 4, "when doing so is reasonably necessary, in ClearPlay's reasonable artistic judgment, for the general appreciation of understanding of the motion picture at issue." Id. The court found, on its own review, that the evidence demonstrated that ClearPlay's decision not to code certain material is

supported by reasonable deference to ClearPlay's artistic judgment. Nissim appeals the district court's order. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

DISCUSSION

Paragraph 12.4 of the Agreement states that issues of interpretation shall be governed by Florida state law. J.A. 462. Under Florida law, interpretation of a contract is a question of law that is reviewed by appellate courts de novo. O'Keefe Architects, Inc. v. CED Constr. Partners, Ltd., 944 So. 2d 181, 185 (Fla. 2006); Miren Int'l Lodging Corp. v. Manley, 982 So. 2d 1203, 1204 (Fla. Dist. Ct. App. 2008). The trial court held that the Agreement was unambiguous. Whether an ambiguity exists in the terms of a contract is a question of law, and the ambiguity must be resolved as a question of fact. Soncoast Cmty. Church of Boca Raton, Inc. v. Travis Boating Ctr. of Fla., Inc., 981 So. 2d 654, 655 (Fla. Dist. Ct. App. 2008). "Language in a document is ambiguous when it is uncertain in meaning and may be fairly understood in more ways than one and is susceptible of interpretation in opposite ways." Barnett v. Destiny Owners Ass'n, Inc., 856 So. 2d 1090, 1092 (Fla. Dist. Ct. App. 2003).

The parties dispute the meaning of two phrases in Paragraph 1.4(iii) of the Agreement, namely "substantial compliance" and "flexibility of artistic judgment." Paragraph 1.4 requires the ClearPlay CustomPlay OC map to:

> be in substantial compliance with the CustomPlay Specifications, it being recognized by the parties that application of the CustomPlay OC Specifications requires flexibility of artistic judgment within the overall goal of maintaining consistency.

J.A. 449 (emphasis added). The key questions to be resolved are how much compliance with CustomPlay OC Specifications is required, and on what basis is ClearPlay allowed to deviate from the CustomPlay specifications.

Nissim argues that "substantial compliance with the CustomPlay Specifications" requires "compliance in the range of 90% or greater."[1] Appellant's Br. 43. Nissim asserts that to determine a percentage of compliance, ClearPlay's filtering choices should be measured against choices Nissim made for the same movies based on the Specifications.[2] ClearPlay argues that the parties could have drafted the License Agreement to require compliance with a numerical standard, but instead chose a more subjective standard, substantial compliance.

The Agreement uses a subjective standard; it does not define this standard with quantitative precision. We will not rewrite the agreement to do so. Nissim acknowledges that coding decisions require subjective judgment. Appellant's Br. 45 (stating that "judgment is sometimes involved in determining what falls within the Specifications' twelve content categories and three explicitness levels"). We also agree that ClearPlay's substantial compliance should not be measured against Nissim's sample OC maps nor should it be measured against the general intent of the Agreement. The Specifications are the standard against which the substantial compliance of ClearPlay's OC maps must be measured according to the plain language

---

[1] For this proposition, Nissim cites <u>Blinderman Construction Co. v. United States</u>, 39 Fed. Cl. 529 (1997), in which the Court of Federal Claims cited several cases from the Board of Contract Appeals for the proposition that objective qualitative measures are important in a test for "substantial completion" in construction contracts. <u>Id.</u> at 573 & n.40. <u>Blinderman</u>, however, relates to interpretation of terms in a construction contract, not a patent settlement agreement, and interprets a different term than the one at issue before us. <u>Blinderman</u> is not binding on this court and irrelevant to our interpretation of the Agreement at issue.

[2] Nissim submitted filters that it created for the selected movies to the Special Master and district court, along with documentation quantitatively comparing its coding choices to those of ClearPlay for the selected movies. Nissim cites these comparisons throughout its briefs as evidence that ClearPlay's OC maps do not substantially comply with the Specifications.

of the Agreement. It is up to the finder of fact to determine if ClearPlay meets that standard for each selected OC map.

The fact that a standard is subjective does not render it per se ambiguous. See Flood v. Union Planters Bank, 878 So. 2d 407, 410 (Fla. Dist. Ct. App. 2004) ("The absence of a definition for this term in [an agreement] does not mean that the term is ambiguous.") (citing State Farm Fire & Cas. Co. v. CTC Dev. Corp., 720 So. 2d 1072, 1076 (Fla. 1998)); id. ("Furthermore, just because a provision may be complex and needs to be analyzed in order to be applied does not mean that it is ambiguous.") (citing Swire Pac. Holdings, Inc. v. Zurich Ins. Co., 845 So. 2d 161, 165 (Fla. 2003)). Merriam-Webster's Collegiate Dictionary (11th Ed. 2003) defines "substantial" as "being largely but not wholly that what is specified." Id. at 1245. Both parties cited the same Black's Law Dictionary definition for "substantial compliance"—"[c]ompliance with the essential requirements." Report at 11 (quoting Black's Law Dictionary 1428 (6th ed. 1990)). Whether a particular filter for a movie is in "substantial compliance" is a question of fact to be determined by the fact finder—namely, whether ClearPlay's OC maps each comply with the essential requirements of the Specifications. See Moore v. Chodorow, 925 So. 2d 457, 461 (Fla. Dist. Ct. App. 2006) ("Whether a party's failure to commit certain actions constitutes a material breach of an agreement is reviewed as a question of fact.").

There are undoubtedly factual questions which will need to be resolved in the course of determining whether there exists substantial compliance for any given filter. For example, and as noted by the Special Master, in Ocean's Eleven the character Reuben constantly holds his signature cigar, an act that is coded as Substance Abuse

in the Specifications.  Report at 23.  Coding all the scenes in which Reuben is holding a cigar would virtually eliminate him from the movie, turning it into "Ocean's Ten."  Id.; Appellee's Br. 14.  It is up to the fact finder to determine whether the decision to not code Reuben holding a cigar is a single act of non-compliance or multiple acts for the purposes of determining substantial compliance.  As another example, if ClearPlay decided to not code much of the final battle in The Last Samurai, with the exception of the most graphic violence, it could also be considered either a single act that may result in substantial compliance or many individual acts of noncompliance that may result in a breach of the Agreement.  The fact finder must determine whether ClearPlay's filters are in substantial compliance with the CustomPlay Specifications.

Nissim also argues that the trial court erred when it concluded that "Paragraph 1.4(iii) grants ClearPlay discretion to depart from the CustomPlay Specifications," Order at 4, "when doing so is reasonably necessary, in ClearPlay's reasonable artistic judgment, for the general appreciation of understanding of the motion picture at issue." Id.  Nissim disagrees with the district court's determination that the Agreement unambiguously grants ClearPlay the right to not code OC that falls within the Specifications, and Nissim argues that the Agreement is much more restrictive in the types of coding choices ClearPlay is allowed to make when exercising its "flexibility of artistic judgment."  Nissim proposes two types of flexibility that it believes ClearPlay may exercise under the Agreement.  First, Nissim argues that the phrase should be interpreted as allowing some judgment in determining what falls within the Specifications' twelve content categories and three explicitness levels.  As Nissim describes in its brief, "a hard back-slap might depict either camaraderie that would not

be coded, or an act of violence that would be coded." Second, Nissim argues that artistic judgment may be used to identify the exact frames at which to start and stop coding in order to provide a seamless artistic impression when removing objectionable content.

ClearPlay disagrees that Paragraph 1.4(iii) is as restrictive as Nissim proposes and argues that the phrase "flexibility of artistic judgment" should be interpreted to allow ClearPlay to choose to code or not code individual instances of possible OC whenever ClearPlay determines that the degree of objectionableness may be outweighed by the material's relevance to the movie. ClearPlay's argument is that it has the discretion under the agreement to code or not code by exercising its artistic judgment, and by doing so ensure that its customers are able to watch a filtered movie that is still understandable and enjoyable. Without this discretion, ClearPlay argues that strictly-filtered films would be incomprehensible and disliked by consumers. For instance, strict compliance with the Specifications when coding both The Last Samurai and The Postman would require the coding of the entire final battle scenes in each as Violence and Bloodshed. Report at 22, 24. A viewer of The Postman would not even know who won the battle. Id. at 24. Similarly, as mentioned above, strictly coding Ocean's Eleven for Substance Abuse would eliminate not only Reuben's character from the film but also many minutes of critical dialogue, such as the scene in which the characters discusses their plan for the heist. Report at 23. Strict coding in West Side Story would require ClearPlay to code the song "Maria" as Mushiness, removing a pivotal scene in the movie. Order at 3.

The problem with ClearPlay's definition of Paragraph 1.4 is that under its interpretation the artistic judgment exception would swallow the substantial compliance rule. The rule is substantial compliance—the Agreement makes that much clear. Whether there is substantial compliance is for the fact finder to determine on a case-by-case basis. The flexibility of artistic judgment allows ClearPlay the discretion to deviate from compliance with the CustomPlay Specifications only in application of the CustomPlay OC Specifications. It defines the way in which something less than full compliance is acceptable under the Agreement. But even exercise of artistic judgment is only allowed "within the overall goal of maintaining consistency." Nissim argues that it was paramount to the successful development of its standard that consistency in application exists, and points out that the most frequent consumer criticism of ClearPlay's prior filtering products was a lack of consistent application. When a user opts for exclusion of certain types of content, the user must be able to rely upon the filter to actually filter out that content. If a user chooses to edit all violence from an inherently violent movie such as The Last Samurai or The Postman, the user may not be able to understand the plot or even know who prevailed in the end. But that is the choice of the user. Neither the CustomPlay Specifications, nor Paragraph 1.4, indicate that ClearPlay can deviate from the Specification whenever it determines that the objectionable material is too important to plot line or movie relevance. ClearPlay's proposed construction would effectively allow 0% compliance to be "substantial compliance" so long as the decisions not to code were each based on ClearPlay's determination that objectionableness was outweighed by the material's relevance. We conclude that this cannot be the correct construction.

The Agreement does, in fact, contain language elsewhere regarding material "essential to general appreciation of understanding of the motion picture." J.A. 453. Paragraph 4.8 allows ClearPlay "to omit coding a category at a specified level of explicitness for a particular motion picture only when the content falling within that category of content at that specified level of explicitness is essential to general appreciation of understanding of the motion picture." Id. The parties both agree that this section allows ClearPlay to choose not to code a particular category at a particular explicitness level if ClearPlay determines that the material is essential to understand the movie. This language appears in Paragraph 4.8; it does not appear in Paragraph 1.4. Paragraph 1.4 does not give similar discretion across the broad spectrum of all categories. In fact, if ClearPlay could in the exercise of its artistic judgment, refuse to code material under Paragraph 1.4 whenever it determined the material's relevance to the movie to outweigh its objectionableness, there would be no need for Paragraph 4.8. Paragraph 4.8 would be entirely superfluous if we accepted ClearPlay's proposed interpretation of Paragraph 1.4.

The Agreement requires "substantial compliance" but allows for some "flexibility of artistic judgment" in applying the Specifications. Even the allowed flexibility must be "within the overall goal of maintaining consistency." Nissim articulates several permissible manners in which artistic judgment may be exercised under Paragraph 1.4. Additionally, the CustomPlay OC Specifications can not and do not detail every possible scenario and how it should be coded. They provide guidelines and give examples from movies explaining how particular scenes would be coded. This leaves a lot of discretion for the exercise of artistic judgment in applying these Specifications. We cannot discern

from the Agreement itself every possible basis upon which ClearPlay is allowed to exercise its artistic judgment and leave individual determinations to the fact finder. Paragraph 1.4 does not, however, allow ClearPlay to use its artistic judgment to refuse to code objectionable material because it believes the relevance to outweigh the objectionableness.

Nissim raises four other issues on appeal: (1) whether ClearPlay's CP-007-USB Players (the 007 Players) "incorporate or contain Modified ClearPlay Software" as required under paragraph 1.13 of the Agreement; (2) whether the 007 Players' software interface "implements the CustomPlay OC Specifications content categories and . . . levels of explicitness"; (3) whether the district court correctly held that ClearPlay's late royalty payments and non-compliant royalty reports did not constitute material breach under paragraph 12.5 and whether Nissim waived the breach by accepting all royalty payments and reports without protest; and (4) whether the district court correctly referred future disputes concerning the compliance of ClearPlay's 007 Filters to the "Mapping Dispute Resolution" process under paragraph 4.6.

We have considered Nissim's arguments with respect to the first two issues and find them to be without merit. As to the third issue, we conclude that Nissim waived its argument that ClearPlay's late royalty payments and noncompliant royalty reports constitute a material breach based on paragraphs 12.2 and 12.5 of the Agreement. Nissim never raised this argument with the district court despite multiple opportunities to do so. See J.A. 436; J.A. 4107; J.A. 5327–64. We therefore will not consider Nissim's argument in the first instance. See Sterling Fin. Inv. Group, Inc. v. Hammer, 393 F.3d 1223, 1226 (11th Cir. 2004) ("The law in our circuit is clear that 'arguments not

presented in the district court will not be considered for the first time on appeal.'" (quoting Mills v. Singletary, 63 F.3d 999, 1008 n.11 (11th Cir. 1995))). With regard to the fourth issue, we lack jurisdiction to consider Nissim's argument that the district court incorrectly referred future disputes concerning the compliance of ClearPlay's 007 Filters to "Mapping Dispute Resolution." We must follow "the bedrock rule that a case or controversy must be based on a real and immediate injury or threat of future injury that is caused by the defendants." Prasco, LLC v. Medicis Pharm. Corp., 537 F.3d 1329, 1339 (Fed. Cir. 2008). We would only have jurisdiction to consider Nissim's final argument if the parties filed a second dispute over the Agreement with the district court and the district court refused to assert jurisdiction.

We vacate the order of the district court and remand for the fact finder to determine whether ClearPlay's OC maps substantially comply with the Specifications in a manner consistent with this opinion.

VACATED and REMANDED

COSTS

No costs.